UNITED STATES of America, Plaintiff-Appellant,

Dr. Viola Coleman et al., Intervenors-Appellants,

v.

MIDLAND INDEPENDENT SCHOOL DISTRICT and James H. Mailey, Superintendent, Defendants-Appellees.

No. 71-3271.

United States Court of Appeals, Fifth Circuit.

Aug. 28, 1975.

Rehearing Denied Nov. 3, 1975.

Garland Casebier, Midland, Tex., for Coleman.

John E. Clark, U. S. Atty., San Antonio, Tex., J. Stanley Pottinger, Asst. Atty. Gen., Brian K. Landsberg, William C. Graves, Louie M. Stewart, Attys., Civil Rights Div., Dept. of Justice, Washington, D. C., for plaintiff-appellant.

Thornton Hardie, Jr., Midland, Tex., for defendants-appellees.

Before WISDOM, COLEMAN and SIMPSON, Circuit Judges.

WISDOM, Circuit Judge:

In this school desegregation case the United States filed its complaint August 7, 1970. The complaint alleged that the Midland Independent School District (MISD) was maintaining separate schools for black and Mexican-American students at the elementary school level.

On September 1, 1970, the trial judge (the late Judge Guinn) found the Midland system to be operating in a unitary fashion, and denied all relief to the United States. On June 28, 1971, this Court vacated the judgment of the district court as it related to pupil assignment in the elementary schools and remanded "with the direction that the district court require the school board *forthwith* to constitute and implement a pupil assignment plan that complies with the principles established in *Swann v. Charlotte-Mecklenburg Board of Education*." *United States v. Midland Independent School District*, 5 Cir. 1971, 443 F.2d 1180.

On remand the district court held that the MISD had never segregated Mexican-American students and denied relief at the one virtually all Mexican-American school in question, the De Zavala Elementary School. The district court also held that the existing plan (which was the subject of the previous appeal) was constitutionally sufficient. Nonetheless the court closed the virtually all-black Washington School. We reverse the judgment of the district court and remand the case with directions.

The Midland Independent School District is a county-wide school system encompassing the city of Midland and the adjacent rural areas. In 1971–72 the total student population was approximately 17,500. Of the 8576 elementary students in the system 14 percent are Negro and 16 percent are Mexican-American. The minority group community is located within the city, east of Big Spring Street, and north and south to the city limits.

The district operates 19 elementary schools, and of these, 7 are east of Big Spring Street. In 1971–72 these 7 elementary schools had an average minority group enrollment of 81 percent. About 99 percent of all black elementary students and 86 percent of all Mexican-American elementary students attend these 7 schools. West of Big Spring Street, in the school district's remaining 12 elementary schools, the student population averages about 96 percent Anglo in each school. About 90 percent of all Anglo elementary students attend these 12 schools.

A supplemental record was filed July 2, 1975, containing school enrollment statistics for 1972–73, 1973–74, and 1974–75

showing the number of students, by race, in each school operated by the Midland Independent School District.

The figures speak for themselves. Figures for the 1970–71 school year show:

|  | Black | Mexican-Americans | White | Total |
|---|---|---|---|---|
| Washington School | 434 | 6 | 0 | 440 |
| De Zavala School | 43 | 368 | 8 | 419 |

Figures for the 1974–75 school year show:

|  | Black | Mexican-Americans | White | Total |
|---|---|---|---|---|
| Washington School | 299 | 13 | 0 | 312 |
| De Zavala School | 31 | 308 | 5 | 344 |

The 1974–75 enrollment statistics also reflect that three other elementary schools operated by the Midland system have virtually all-minority enrollments:

| School | Black | Spanish Surnamed | Anglo | Minority Percentage 1971–72 | Minority Percentage 1974–75 |
|---|---|---|---|---|---|
| Crockett | 167 | 293 | 12 | 97 | 97 |
| Milam | 187 | 224 | 31 | 81 | 92 |
| Pease | 388 | 78 | 10 | 99 | 97 |

The record clearly demonstrates that the Midland School District deliberately segregated Mexican-Americans from Anglos. In 1912 the school board resolved to "provide [a] separate school for Mexicans if demanded", and instructed the superintendent to "make preliminary negotiations with representatives of Mexicans". The "demand" in the Mexican community was met in 1914 when "[t]he board decided to offer the Mexican children a school and a teacher to themselves, and the president was instructed to give official notice to the Catholic Priest to this effect". This school operated for grades 1–8 until the mid 1940's and was until that time a terminal facility, beyond which Mexican-American students could not proceed. No student of Mexican ancestry (Spanish surname) graduated from the Midland senior high schools until 1952. The admission of Mexican-Americans to the junior high school, which was not necessary so long as the Mexican school served grades 1–8, was not approved until 1946.

The Mexican school, which came to be known as the Latin-American school, and subsequently De Zavala School has historically been an all Mexican-American facility. Mexican-American students were bused into the school; Anglo students living near the school attended school elsewhere.

Elementary schools zones were first used in 1946. The zones then did not include the Negro or Mexican-American schools, but placed black students attending the Carver School in the South Elementary School Zone, and placed Mexican-American students attending the De Zavala School in the North Elementary School Zone. Both North and South Elementary Schools were at this time exclusively Anglo facilities. De Zavala did not have a student attendance

zone until 1956, the same year the Booker T. Washington Elementary School was zoned, under the school board's resolution to desegregate. The neighborhood zone as then drawn exactly circumscribed El Barrio or Mexican Town. De Zavala has been expanded by the defendants to meet the growing Mexican-American population in the area before and after the drawing of the attendance zone.

This zone was supplemented by a transfer policy which allowed a student to attend the school "in which his racial group predominate[d]". Anglo students living in the De Zavala zone took advantage of this policy to transfer to elementary schools more distant. In 1968 the school board determined that transfers would henceforth be made "without regard to race or national origin" but by that time the policy had become too established to be affected by this resolution of the board. In 1974–75 there were only 5 Anglos in a total student body of 344.

*Morales v. Shannon*, 5 Cir. 1975, 516 F.2d 411 is similar on the facts to the case now before us. In that case too there had been, historically a "Mexican School" in the Uvalde system. Later there were two elementary schools populated by Mexican-American students. In 1954 the Robb school was constructed in the Mexican-American neighborhood and in 1966 the Anthon school was constructed to replace one of the two old Mexican-American elementary schools. Judge Bell, speaking for the Court, pointed out: "The imposition of the neighborhood assignment system froze the Mexican-American students into the Robb and Anthon schools. There could have been no other result and this is strong evidence of segregatory intent. This evidence becomes overwhelming

when considered in tandem with an additional fact. The Uvalde system consists of the City of Uvalde plus a rural area and freedom of choice assignment was continued as to the approximately 300 students residing in the rural area." The totality of facts in this case along with the historical recognition of De Zavala as the Mexican-American school equally demonstrated the segregatory intent of the MISD.

In another recent case, involving the Dallas School system, the Court, through Judge Simpson, recognized that the Dallas Independent School District had a "history of practicing *de jure* discrimination against Mexican-Americans" by "isolat[ing] the Mexican-American students in DISD from white students and the DISD's practice of 'integrating' its Mexican-American students with black students". *Tasby v. Estes*, 5 Cir. 1975, 517 F.2d 92. The Court cited two en banc decisions of this Court for the holding that "at least in the State of Texas, segregation of Mexican-Americans in the public school constitutes a deprivation of the equal protection of the laws in violation of the Fourteenth Amendment to the United States Constitution".[1] *United States v. Texas Education Agency, Austin Independent School District*, 5 Cir. 1972, 467 F.2d 848 (motion for clarification denied 1973, 470 F.2d 1001); *Cisneros v. Corpus Christi Independent School District*, 5 Cir. 1972, 467 F.2d 142, cert. denied 1973, 413 U.S. 920, 93 S.Ct. 3053, 37 L.Ed.2d 1041, reh. denied 1973, 414 U.S. 881, 94 S.Ct. 31, 38 L.Ed.2d 129.

These two cases were decided before the Supreme Court rendered its decision in *Keyes v. School District No. 1., Denver, Colorado*, 1973, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548. The language in our opinions in the Austin and Corpus Christi cases defining *de jure*

1. See also, Comment, De Jure Segregation of Chicanos in Texas Schools, 7 Harv.Civ.Rts.—Civ.Lib.Rev. 307 (1972); U.S.Comm. on Civil Rights, Ethnic Isolation of Mexican-American in the Public Schools of the Southwest (1971); Comment, Mexican-Americans and the Desegregation of Schools in the Southwest, 8 Hous. L.Rev. 929 (1971).

segregation, absent segregation by statute, is broader than the language employed by the Supreme Court in its analysis of *de jure—de facto* segregation. Justice Brennan, for the majority, said:

> We emphasize that the differentiat[ion] factor between *de jure* segregation and so-called *de facto* segregation to which we referred [to] in *Swann* is purpose or intent to segregate.

413 U.S. at 208, 93 S.Ct. at 2697. The facts in the Austin and Corpus Christi cases, however, as in this case, show an overriding intent by the school boards in those districts to isolate, to segregate, Mexican-Americans and blacks.[2]

There is no *de jure—de facto problem as to Washington School. Booker T. Washington Elementary School in 1953 was a Negro school as required by the Texas Constitution, Art. VII, Sec. VII. It still has no Anglos and only 13 Mexican-Americans. It is a vestigial product of de jure segregation.*

The judgment of the district court approving the desegregation plan for elementary schools in the Midland Independent School District is reversed. The district court should immediately take the necessary steps to completely dismantle the dual system in the elementary grades, in the light of recent decisions of this Court, particularly those referred to in this opinion.

---

**2.** In *Keyes* the Supreme Court used the following phrases: "deliberate racial segregation" "systematic program of segregation" "obvious . . . effect" "conscious knowledge" "clear effect" "racially inspired school board actions" and "purposefully segregative policies". See also *Morales v. Shannon*, 5 Cir. 1975, 516 F.2d 411, in which the Court found a "segregatory intent" from the imposition of the neighborhood assignment school. This Court has said that segregation is unlawful when the school district knew the "natural and foreseeable consequences" of its acts. *United States v. Texas Education Agency*, 5 Cir. 1972, 467 F.2d 848, 863.