Ronald BRADLEY et al.,
Plaintiffs-Appellees,

v.

William G. MILLIKEN, Governor et al.,
Defendants-Appellees,

and

Board of Education of the School District of the City of Detroit et al., Defendants-Appellants.

Nos. 78–1597, 79–1005.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 11, 1980.

Decided April 14, 1980.

George T. Roumell, Jr., Thomas M. J. Hathaway, Riley & Roumell, Craig W. Lange, Detroit, Mich., for Board of Ed., et al.

Louis R. Lucas, Ratner, Sugarmon, Lucas, Salky & Henderson, Memphis, Tenn., Kenneth Penegar, Knoxville, Tenn., Thomas I. Atkins, Atkins & Brown, Boston, Mass., for Ronald Bradley, et al.

Theodore Sachs, Marston, Sachs, Nunn, Kates, Kadushin & O'Hare, Detroit, Mich., Nathanial Jones, Gen. Counsel, NAACP, New York City, Frank Kelley, Atty. Gen. of Mich., Robert A. Derengoski, Sol. Gen., Gerald F. Young, Paul Zimmer, Ruthanne Gartland, Lansing, Mich., Samuel E. McCargo, Detroit, Mich., for William G. Milliken, et al.

Before EDWARDS, Chief Judge, and PHILLIPS and PECK, Senior Circuit Judges.

HARRY PHILLIPS, Senior Circuit Judge.

On July 25, 1974, the Supreme Court remanded this case to the district court for "prompt formulation of a decree directed to eliminating the segregation found to exist in Detroit city schools, a remedy which has been delayed since 1970." *Milliken v. Bradley*, 418 U.S. 717, 753, 94 S.Ct. 3112, 3131, 41 L.Ed.2d 1069 (1974) (*Milliken* I). Nearly six years have elapsed since that remand, and almost ten years since this litigation began, yet we are unable to hold on the record before us that de jure segregation has been eliminated from the Detroit school system. We conclude that we must send the case back to the district court for further proceedings.

The present appeal presents four questions for decision: (1) Did the district court err in holding that population and demographic changes in Detroit have obliterated all traces and effects of past acts of discrimination by the Detroit School Board and the State of Michigan? Part II of this opinion rejects the ruling of the district court as contrary to the law of this case and clearly erroneous. (2) Was the district court correct in holding that the overwhelming percentage of black students in the Detroit school system precludes including in the pupil assignment plan any of the schools in the three inner-city regions of the school district? Part III of this opinion concludes the district court's holding was error, and outlines the standards to be applied by the district court when it reconsiders inner-city pupil reassignment on remand. (3) Was it error for the district court to order additional pupil reassignments between schools in Regions 1 and 2? Part IV of the opinion affirms in principle the propriety of additional pupil reassignments, but remands the case for a hearing on the question whether Hispanic students should be treated as white for desegregation purposes. (4) Did District Judge Rob-

ert E. DeMascio abuse his discretion in declining to recuse himself from the remand proceedings in this case? Part V finds no abuse of discretion, but suggests, in view of the bitter feelings that have developed, that the case be reassigned to another judge on remand from this court's decision on the present appeal.

## I

This protracted litigation began in 1970. On April 7 of that year, the Detroit Board voluntarily adopted a modest plan to desegregate some of the Detroit high schools. The State legislature, however, blocked implementation of that plan by enacting § 12 of Act No. 48, Public Acts of 1970. A citizen-initiated recall election resulted in the replacement of the four Board members who had favored the April 7 plan, and the reconstituted Board rescinded the plan.

The plaintiffs filed this suit on August 18, 1970, alleging that § 12 of Act No. 48 was unconstitutional and praying for a preliminary injunction requiring the Board to implement the April 7 plan. The late District Judge Stephen J. Roth denied plaintiffs' application for a preliminary injunction and they appealed. This court held § 12 of Act No. 48 unconstitutional, but affirmed the denial of a preliminary injunction and remanded for a trial on the merits. 433 F.2d 897 (6th Cir. 1970). On remand, Judge Roth again refused to grant a preliminary injunction, and this court affirmed, again directing a trial on the merits. 438 F.2d 945 (6th Cir. 1971).

The case was tried on the issue of segregation from April 6, 1971 to July 22, 1971. On September 27, 1971, Judge Roth issued his ruling on the issue of segregation, finding both the State of Michigan and the Detroit Board[1] had committed "acts which have been causal factors in the segregated condition of the public schools in the City of Detroit," 338 F.Supp. 582, 592 (E.D.Mich. 1971).

Judge Roth determined that true desegregation could not be accomplished within the geographical limits of Detroit. Distributing the relatively small number of white students remaining in the district throughout the schools, he held, would render the entire system identifiably black. Accordingly, he ordered the defendants to submit metropolitan plans for desegregation. 345 F.Supp. 914 (E.D.Mich.1972).

This court, sitting en banc, affirmed both the finding of de jure segregation and the propriety of an interdistrict remedy. 484 F.2d 215 (6th Cir. 1973).

The Supreme Court granted certiorari and reversed in part. The Court held the district court had no equitable power to include in its remedial decree any school district whose racial composition had not been shown to be the product of de jure segregation. The defendants did not, however, challenge the district court's finding of de jure segregation within the city of Detroit. Accordingly, the Court remanded the case for formulation of a Detroit-only remedial decree. 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) (*Milliken* I).

Judge Roth had died shortly before the Supreme Court issued its opinion, and District Judge Robert E. DeMascio was assigned the difficult task of formulating a decree which would eliminate the effects of de jure segregation from the Detroit school system without transgressing the limits set by the Supreme Court in *Milliken* I. Judge DeMascio required the parties to submit desegregation plans, but rejected them as unsatisfactory. His August 15, 1975 opinion, reported at 402 F.Supp. 1096 (E.D.Mich. 1975), established guidelines to be met by an acceptable remedial plan. Hereafter, they are referred to as the August 15 guidelines.

On November 4, 1975, Judge DeMascio adopted a desegregation plan drafted by

---

1. Nothing in this opinion is intended to reflect adversely upon the present Detroit Board of Education. Throughout the course of this often bitter litigation members of the present Board have cooperated with the district court's endeavor to remedy the unconstitutional de jure segregation created by acts and policies of their predecessors and former State officials. References in this opinion to the Board's discriminatory acts should be read as references to the actions of past, not present, Board members.

the Detroit Board in an effort to conform to the August 15 guidelines. 411 F.Supp. 943 (E.D.Mich.1975). This plan provided for changes in pupil assignments in five of the eight administrative regions of the Detroit school district, excluding inner-city Regions 1, 5 and 8 which are overwhelmingly black. In addition, the remedial decree provided for various Educational Components, requiring establishment of certain training, remedial, testing, counseling, monitoring and public relations programs.

This court affirmed the remedial decree's Educational Components and the portion of the pupil reassignment plan that required reassignments within Regions 2, 3, 4, 6 and 7. We found that excluding Regions 1, 5 and 8 from the pupil reassignment plan left approximately 83,000 students with no relief from unconstitutional de jure segregation. Moreover, we noted, these three Regions are in the area most affected by the previously found illegal acts. This being the case, the Board had assumed the burden of showing that the segregation existing in Regions 1, 5 and 8, which were excluded from the plan, was not the result of the defendants' present or past discriminatory actions. Since the record disclosed no adequate justification for limiting the pupil reassignment plan to five Regions, we remanded the case for further consideration in regard to schools located in the inner-city Regions. 540 F.2d 229 (6th Cir. 1976).

The Supreme Court affirmed the propriety of the decree's Educational Components, and their validity no longer is an issue in this case. Neither the district court's pupil reassignment plan nor this court's partial reversal was challenged in the Supreme Court, and it had no occasion to rule thereon. 433 U.S. 267, 279, 97 S.Ct. 2749, 2756, 53 L.Ed.2d 745 (1977) (*Milliken* II).

Before the district court commenced remand proceedings, the plaintiffs moved Judge DeMascio to recuse himself from the case. Relying on 28 U.S.C. § 455(a) and Canon 3A(4) of the Code of Judicial Conduct, the plaintiffs complained that Judge DeMascio had created an appearance of partiality by engaging in *ex parte* contacts with experts, community groups and the Detroit Board in the process of developing his desegregation guidelines and remedial decree. Judge DeMascio declined to recuse himself. 426 F.Supp. 929 (E.D.Mich.1977). However, he referred to the Chief Judge of the District the question whether his prior conferences with the Detroit Board and the teachers' union aimed at averting a strike, coupled with his August 28, 1975, order directing faculty reassignments, had created the appearance that he had prejudged the faculty assignment issue. On referral from the Chief Judge, District Judge James P. Churchill agreed with Judge DeMascio that recusal was not required. 426 F.Supp. at 943–44.

On the merits, Judge DeMascio reaffirmed his prior conclusion that Regions 1, 5 and 8 need not and cannot be included in the pupil reassignment plan. 460 F.Supp. 299 (E.D.Mich.1978). He held that pronounced demographic shifts, together with the predominance of the black student population, have obliterated the effects of defendants' prior acts of de jure segregation. Current residential patterns, not school assignments, he said, account for the one-race character of the inner-city schools. Accordingly, Judge DeMascio held that the present assignment pattern is free from the vestiges of prior discrimination and that the Board had borne its heavy burden of justifying the exclusion of the inner-city regions from the pupil reassignment plan. 460 F.Supp. at 307–08.

Nevertheless, the court found there were some white students available in Region 2 to desegregate certain Region 1 schools. The Board objected that many of these white students were Spanish dominant Hispanics involved in bilingual educational programs that would be disrupted by additional pupil reassignments. However, Judge DeMascio felt this court's opinion mandated whatever reassignments were possible, despite any burden on bilingual programs. 460 F.Supp. at 312. In a supplemental opinion, Judge DeMascio ordered the Detroit Board to develop a plan for reassigning pupils between Regions 1 and 2 which

would provide for bilingual education in receiving schools. On November 11, 1978, the court adopted the Board's responsive plan. 460 F.Supp. 325 (E.D.Mich.1978).

The Detroit Board appeals on the ground that the district court exceeded its authority by ordering additional pupil reassignments between Regions 1 and 2. The plaintiffs cross-appeal from Judge DeMascio's decision not to recuse himself, his holding that demographic changes have obliterated the effects of defendants' prior discriminatory acts, and his conclusion that Regions 1, 5 and 8 were properly excluded from the pupil reassignment plan. This court stayed implementation of the additional reassignment plan pending the outcome of this appeal.

II

■ The first question we address is whether Judge DeMascio was correct when he decided that demographic changes and the growth of the Detroit school system's proportion of black students have obliterated the effects of defendants' past discriminatory actions. We conclude that this holding of the district court is refuted overwhelmingly by the record.

Judge DeMascio's conclusion apparently was based on his belief that the only effect of defendants' past discriminatory actions was to allow white students to escape from integrated schools in racially changing residential areas:

This was so because the actions which formed the basis for Judge Roth's liability findings were basically reactions by the Detroit Board of Education to changing residential patterns. The optional and gerrymandered attendance zones served the purpose of keeping white students out of schools that, in the absence of such policies, would have become, and in fact have become, integrated naturally. Judge Roth did not find, however, that these policies in turn created additional residential segregation which in turn created additional school segregation. Had he made such findings, and had such findings been supported in the record, we

assume the Supreme Court would have affirmed the propriety of an interdistrict remedy.

460 F.Supp. at 307–08.

Accordingly, Judge Demascio thought the defendants' actions could have had only temporary segregative effects, effects that had been nullified by the almost total displacement of whites from formerly integrated neighborhoods:

These pronounced demographic shifts, first predicted by Judge Roth, and the predominance of the black student population have obliterated the optional and gerrymandered attendance zones which permitted white students to avoid attending integrated schools, the practice of bussing black students from overcrowded schools beyond a closer white school and the practice of altering feeder patterns in racially changing neighborhoods.

(Footnote omitted.) 460 F.Supp. at 307.

The problem with this conclusion of the district court is that it is contrary to the law of this case as established by Judge Roth and affirmed by this court and by the Supreme Court in *Milliken* I.

Judge Roth found that the Detroit Board had done at least four things to maintain a dual school system in Detroit: First, during the 1950's, the Board "created and maintained optional attendance zones in neighborhoods undergoing racial transition and between high school attendance areas of opposite predominant racial compositions." 338 F.Supp. at 587. "The natural, probable, foreseeable and actual effect of these optional zones was to allow white youngsters to escape identifiably 'black' schools." *Id.* Second, the Board "admittedly bused black pupils past or away from closer white schools with available space to black schools," but only in one instance, necessitated by the burning of a white school, did the Board bus white children to a black school. 338 F.Supp. at 588. Third, the Board "created and altered attendance zones, . . . grade structures and . . . feeder school patterns in a manner which . . . [maintained] black and white pupils in racially segregated schools." *Id.* Fi-

nally, by constructing many small schools and locating new schools in areas of one race, the Board negated opportunities to integrate, contained the black population, and compounded school segregation. *Id.*

The plaintiffs presented evidence that the Board's discriminatory actions affected not only schools but residential patterns. For example, in affirming Judge Roth's finding of de jure segregation, this court quoted the following exchange between plaintiffs' counsel and Dr. Gordon Foster of the University of Miami, director of the Florida School Desegregation Consulting Center, concerning optional attendance zones:

"Q. Doctor Foster, from your examination of the 1950 census and in turn the 1960 census exhibits, do you have an opinion as the effect of such an optional zone on the community residence pattern in the community?

\* \* \* \* \* \*

"A. Community people and residents in a situation such as this generally have a perception that there is something wrong with their school, that the whites need an optional zone to get out into a less black situation and, therefore, this increases their perception of racial isolation and, in fact, physical containment.

"Q. Does this have an effect, Doctor, in terms of the residence pattern? I believe you testified in 1950 the optional area was entirely white or zero to 4.9 per cent white.

\* \* \* \* \* \*

"A. In my opinion this tends to increase the instability of the community because they generally feel this is an ad hoc temporary interim situation and it increases white flight in this sort of situation.

484 F.2d at 234.

At another point, Dr. Foster testified that locating new schools in one race areas rather than integrated areas tends to isolate the new school's attendance zone and perpetuate its racial identity. 484 F.2d at 238.

Responding to this and other evidence, Judge Roth found the Board's discriminato-

ry policies were partially responsible for segregated residential patterns:

Governmental actions and inaction at all levels, federal, state and local, have combined, with those of private organizations, such as loaning institutions and real estate associations and brokerage firms, to establish and to maintain the pattern of residential segregation throughout the Detroit metropolitan area.

. . . [A]ll of them, including the school authorities, are, in part, responsible for the segregated condition which exists. And we note that just as there is an interaction between residential patterns and the racial composition of the schools, so there is a corresponding effect on the residential pattern by the racial composition of the schools.

338 F.Supp. at 587.

*See also* Judge Roth's seventh conclusion of law, 338 F.Supp. at 593.

In affirming Judge Roth's findings on the issue of segregation, we stated:

This record contains a substantial volume of testimony concerning local and State action and policies which helped produce residential segregation in Detroit and in the metropolitan area of Detroit. In affirming the District Judge's findings of constitutional violations by the Detroit Board of Education and by the State defendants resulting in segregated schools in Detroit, we have not relied at all upon testimony pertaining to segregated housing except as *school construction programs helped cause or maintain such segregation.*

484 F.2d at 242 (emphasis supplied).

*See also Milliken I supra,* 418 U.S. at 724 and 728 n. 7, 94 S.Ct. at 3117 and 3119 n. 7 (acknowledging Judge Roth's and this court's *partial reliance on de jure school segregation as one cause of residential segregation*).

Moreover, Judge Roth's conclusion that present Detroit housing patterns reflect the Board's past discrimination accords with the analysis of the Supreme Court in *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 20–21, 91 S.Ct. 1267, 1278, 28 L.Ed.2d 554 (1971):

The construction of new schools and the closing of old ones are two of the most important functions of local school authorities and also two of the most complex. They must decide questions of location and capacity in light of population growth, finances, land values, site availability, through an almost endless list of factors to be considered. The result of this will be a decision which, when combined with one technique or another of student assignment, will determine the racial composition of the student body in each school in the system. Over the long run, the consequences of the choices will be far reaching. People gravitate toward school facilities, just as schools are located in response to the needs of people. The location of schools may thus influence the patterns of residential development of a metropolitan area and have important impact on composition of inner-city neighborhoods.

In the past, choices in this respect have been used as a potent weapon for creating or maintaining a state-segregated school system. In addition to the classic pattern of building schools specifically intended for Negro or white students, school authorities have sometimes, since *Brown* [*v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873], closed schools which appeared likely to become racially mixed through changes in neighborhood residential patterns. This was sometimes accompanied by building new schools in the areas of white suburban expansion farthest from Negro population centers in order to maintain the separation of the races with a minimum departure from the formal principles of "neighborhood zoning." Such a policy does more than simply influence the short-run composition of the student body of a new school. It may well promote segregated residential patterns which, when combined with "neighborhood zoning," further lock the school system into the mold of separation of the races. Upon a proper showing a district court may consider this in fashioning a remedy.

*See also Adams v. United States*, 620 F.2d 1277, 1290, 1291 (8th Cir. 1980) (massive demographic shifts that have rendered the St. Louis school district 75 per cent black have incorporated rather than wiped out the segregative effects of the system's prior de jure discriminatory policies: "public perception of the racial identity of a school can be, and often is, a powerful factor in shaping the residential patterns of a neighborhood").

In *Keyes v. School District No. 1*, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973), the Supreme Court held that the discriminatory practices of a school district may have the effect of earmarking a school according to its racial composition, and this, in turn, may have a profound reciprocal effect on the racial composition of residential neighborhoods. The Court said:

[T]he practice of building a school . . . to a certain size and in a certain location 'with conscious knowledge that it would be a segregated school,' . . . has a substantial reciprocal effect on the racial composition of other nearby schools. So also, the use of mobile classrooms, the drafting of student transfer policies, the transportation of students, and the assignment of faculty and staff, on racially identifiable bases, have the clear effect of earmarking schools according to their racial composition, and this, in turn, together with the elements of student assignment and school construction, may have a profound reciprocal effect on the racial composition of residential neighborhoods within a metropolitan area, thereby causing further racial concentration within the schools.

413 U.S. at 201–02, 93 S.Ct. at 2694.

The clear import of Judge Roth's holding is that the defendants' discriminatory policies helped to drive whites from the Detroit school district and to contain blacks in an ever-expanding core area of the city. Viewed in this light, Judge DeMascio's holding, urged by the Board before this court, is that the segregative effects of the defendants' discriminatory policies have been obliterated by the very demographic

changes those policies helped to produce. We conclude that this argument refutes itself.

It is the law of this case that the unconstitutional actions of defendants, both local and State, contributed to the segregated residential patterns and the one race schools that now exist in Detroit. Judge Roth found that de jure school segregation encouraged whites to flee from racially changing neighborhoods and ultimately from the Detroit school district. That finding is supported by substantial record evidence and ample legal precedent. This being so, we reverse Judge DeMascio's holding that population changes have obliterated the effects of the Board's past discrimination. This holding is contrary to the law of this case and, treated as a finding of fact, is clearly erroneous. On the contrary, the record demonstrates that these population changes themselves are in part vestiges of past discrimination.

### III

We turn our attention next to the holding of the district court that the overwhelming percentage of black students in the school district as a whole and particularly in the inner-city regions, coupled with the small number of white students even theoretically available for reassignment, foreclose the possibility of including any schools located in Regions 1, 5 and 8 in the pupil reassignment plan. We find this holding constitutionally insupportable.

The last time this case was before us, we reversed the exclusion by the district court of the inner-city regions from the pupil reassignment plan. We recognized then that "the overwhelming number of black students in Detroit and their concentration in the inner-city undoubtedly makes some one-race schools unavoidable under any 'Detroit only' remedy." 540 F.2d at 237. However, in order to justify eliminating the inner-city regions entirely, we said, the Board would have to show the resultant all black schools are not the product of past discrimination. This would be particularly difficult, we warned, because these very

regions were the ones hardest hit by past acts of de jure segregation. 540 F.2d at 238. "We cannot hold," we concluded, "that where unconstitutional segregation has been found, a plan can be permitted to stand which fails to deal with the three regions where the majority of the most identifiably black schools are located." 540 F.2d at 240.

On remand, the Detroit Board attempted to justify its exclusion of Regions 1, 5 and 8 by presenting evidence that the shift from white to black in the district had accelerated well beyond former demographic predictions and made inner-city desegregation impossible. The Board's figures established that the percentage of black students in the district is increasing despite a decline in the total enrollment. Of the children who enter Detroit kindergartens, a greater proportion of blacks than whites remain in the system throughout their school years. Mr. Hendrickson, the Board's expert, projected the district's enrollment would be 91.8% black by 1981. Moreover, the district court found, residential areas near the school district's fringe are becoming increasingly black as inner-city families replace whites who leave the district entirely. 460 F.Supp. at 305–07.

Judge DeMascio felt the Board's evidence established that no more desegregation of Regions 1, 5 and 8 is possible. 460 F.Supp. at 307. He concluded that integrating the inner-city schools would require the Board to scatter the remaining white students to such an extent that there would be no meaningful interaction between the races in any school. The result would be mere token integration of the inner-city schools achieved at the cost of disrupting previously approved assignment patterns that effectively desegregate the schools in other regions.

To illustrate the futility of attempting to include the inner-city regions, Judge DeMascio turned to statistics. Pointing out that the district court had repeatedly rejected the notion of making all schools identifiably black, Judge DeMascio held that only the excess of non-black over black stu-

dents in any given school could be considered available for reassignment to schools in Regions 1, 5 and 8. The Board's evidence showed there were 31 majority white elementary schools in the district with 3397 students available for reassignment. Six middle schools had 733 students available and one high school had 175. However, the Board's evidence also showed the black enrollment in inner-city elementary schools was 38,259 or 11 times the number of whites available for reassignment. The comparable figures for inner-city middle and high schools were 17,015 and 17,783, or 23 times and 100 times the respective numbers of white students available for reassignment. 460 F.Supp. at 310. Accordingly, the court found, to disperse these few available white children among the schools in Regions 1, 5 and 8 would accomplish nothing more than token integration, a result this court had previously rejected. 460 F.Supp. at 310, citing 540 F.2d at 239.

The flaw in the district court's logic was its assumption that Regions 1, 5 and 8 must be treated as units, and that integrating schools in these Regions must be an all-or-nothing proposition. From the outset of this litigation's post-*Milliken I* remedial phase, Judge DeMascio seems to have assumed that the inner-city regions must be treated in isolation from the rest of the district. *See, e. g.,* 402 F.Supp. at 1129 (holding that the negligible benefits of including the inner-city do not justify "the extraordinary remedy of such cross-regional bussing"). Yet it was exactly this unitary treatment of Regions 1, 5 and 8 that led us to reverse and remand the last time this case was before us. Citing *Davis v. Board of Commissioners of Mobile County,* 402 U.S. 33, 38, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971), in which the Supreme Court refused to permit isolated treatment of one part of metropolitan Mobile, we found it "equally unacceptable to treat Regions 1, 5 and 8 in isolation from the rest of the Detroit school system." 540 F.2d at 238.

We see no reason to treat the borders of the Detroit school system's inner-city administration regions as sacrosanct. In the first place, Detroit's regional scheme of school administration originated with Act No. 48, Public Laws of 1970, the same law whose § 12 we found to be an unconstitutional interference with the Board's attempts to desegregate Detroit high schools. Were we to view the Act's remaining provisions as creating barriers to constitutionally required desegregation, we would have to hold them unconstitutional also. *United States v. Scotland Neck Board of Education,* 407 U.S. 484, 489, 92 S.Ct. 2214, 2217, 33 L.Ed.2d 75 (1972); *Wright v. Council of the City of Emporia,* 407 U.S. 451, 461–62, 92 S.Ct. 2196, 2202–03, 33 L.Ed.2d 51 (1972). Furthermore, there is nothing in the Supreme Court's holding in *Milliken I, supra,* 418 U.S. at 745–46, 94 S.Ct. at 3127–28, that renders inviolable the lines of Administrative Regions within the Detroit School District. Judge Roth's ruling that the Detroit Board carried out a systematic program of segregation established a predicate for finding a dual school system in all the regions. *See Keyes v. School District No. 1, Denver, Colo.,* 413 U.S. 189, 201, 93 S.Ct. 2686, 2694, 37 L.Ed.2d 548 (1973). In such a situation, a district court may disregard the boundaries of administrative regions in order to vindicate constitutional rights. *Milliken I, supra,* 418 U.S. at 745, 94 S.Ct. at 3127.[2]

The district court erred when it held that Regions 1, 5 and 8 must be excluded in their entirety from the pupil reassignment plan. The proper inquiry after this court's last remand was not whether there are enough white students available to desegregate *every* inner-city school. This court has recognized from the first that some one race schools are unavoidable under a Detroit-only plan. *See* 540 F.2d at 237; 484 F.2d at 249. It, therefore, is irrelevant that there are 11 times as many black students in all the inner-city elementary schools combined

---

**2.** In fact, Judge DeMascio's remedial guidelines specified that, when the Board attempted re-zoning to achieve integration in other regions without transporting students, "regional lines

need not be respected; when the choice is between preserving regional lines and bussing, regional lines must give way." 402 F.Supp. at 1134.

as there are white students available for reassignment. What is crucial is whether those 3,397 white students can practically be reassigned to achieve effective levels of desegregation in *some* of the inner-city schools. That, and the analogous questions concerning the middle and high schools, are the issues the district court should have addressed and is directed to address on remand from this decision. The small number of white students available for reassignment and the problems involved in transporting them may justify excluding some, and perhaps many, inner-city schools from the pupil reassignment plan. We emphasize that the need to cross regional lines does not justify such exclusion.[3]

On remand, the district court should apply substantially its August 15, 1977, remedial guidelines, 402 F.Supp. 1096, 1134, *supra*, but without regard to the boundary lines of administrative regions. White students should be considered available for reassignment only to the extent exchanging them with pupils from inner-city schools will not render formerly integrated schools identifiably (more than 55 per cent) black. Where practicable, attendance zones should be redrawn across regional lines to include inner-city pupils in integrated schools. Where rezoning is impossible, as we anticipate it will be in most instances, schools with white students available for reassignment should be paired with the closest feasible inner-city school. In order to achieve effective levels of desegregation, it may be necessary to pair several white schools with a single black school. Such pairing should be done with a view toward minimizing the amount of transportation required. In some situations, it may be that the small number of white students available for reassignment from a particular school, cou-

pled with the distance they would have to be transported to reach an inner-city school that can be paired with other white schools, will justify maintaining present assignment patterns.

We emphasize that this remand is not intended to disrupt previously approved assignment patterns. As we said the last time this case was before us, "the steps which [the district court] has taken thus far appear to us to be consistent with the fourteenth amendment." 540 F.2d at 240. The district court's error was its failure to apply its remedial guidelines to schools in all the regions. Doing so may well achieve at least some additional desegregation, and it is for this purpose that we are remanding.

Nor are our remand instructions intended to be a straight jacket on the district court. We recognize that the district court must balance a variety of individual and collect interests in an effort to arrive at "a plan that promises realistically to work . . . *now.*" *Green v. County School Board*, 391 U.S. 430, 439, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968). Flexibility is essential to that end.

Our last opinion in this case mirrored our frustration at our inability to chart a course that would guide the district court to desegregate the entire school district:

We recognize that it would be appropriate for us at this point to supply guidelines to the District Judge as to what he should do under this remand. Omission of such guidelines is not based on any failure to consider the problem in depth. It is based upon the conviction which this court had at the time of its en banc opinion in this case—and for the reasons carefully spelled out therein—that genuine constitutional desegregation can not

---

**3.** The decision of the district court to treat the inner-city regions as units and to exclude them entirely from the reassignment plan distinguishes this case from *Calhoun v. Cook*, 522 F.2d 717 (5th Cir. 1975), *rehearing denied*, 525 F.2d 1203 (1975). The *Calhoun* court refused, in light of Atlanta's 85 per cent black student population, to order further pupil reassignments even though 92 of the system's 148 schools were over 90 per cent black. However,

there is no indication those 92 identifiably black schools were concentrated in one or several administrative regions left wholly untouched by the pupil reassignment plan. Moreover, if we were convinced that the Fifth Circuit permitted Atlanta's desegregation plan to be limited by intra-district administrative lines, we would be forced to disagree with its decision.

be accomplished within the school district boundaries of the Detroit School District. 540 F.2d at 240.

The district court, however, apparently interpreted the above-quoted comment as a recognition by this court that effective pupil reassignments cannot be achieved in *any* of the schools in the three inner-city regions. *See* 460 F.Supp. at 304. Our comment was not so intended and should not be so read. Although genuine constitutional desegregation may be impossible within the Detroit district, this court has the obligation to see that all practicable steps are taken to remedy the unconstitutional segregation that has been found to exist. To that end, the district court's exclusion of all schools in Regions 1, 5 and 8 from the pupil reassignment plan is reversed and the cause remanded for further consideration in light of this opinion.

## IV

■ Despite his conclusion that "no more desegregation is feasible in Regions 1, 5 and 8 collectively," 460 F.Supp. at 307, Judge DeMascio determined there are white students in Region 2 available for reassignment to Region 1 schools. 460 F.Supp. at 311–12. Accordingly, he ordered the Detroit Board to prepare a supplemental pupil reassignment plan. The Board argues the district court exceeded its authority by requiring further reassignments. We reject that argument. However, we vacate the court's order and remand the case for a hearing on the question whether Hispanic students should be treated as white for desegregation purposes.

The district court found Region 2 is unique among Detroit's administrative regions in that it has not experienced much growth since 1974 in the percentage of its students who are black. Indeed, the court found, some Region 2 schools had fewer black students in 1977 than in 1974. 460 F.Supp. at 311. Overall, black students accounted for only 62% of the Region's 1977 enrollment. Furthermore, fourteen elementary schools in Region 2 had a total of 2145 white students available for reassign-

ment. Thus, the court concluded, numbers alone pose no obstacle to reassigning Region 2 whites to Region 1 schools. *Id.*

Judge DeMascio apparently felt the concentration in Region 2 of programs of bilingual education for Spanish dominant children accounted for the relatively slow growth of the black enrollment in that Region. We agree with the plaintiffs that restricting bilingual programs to one region provides Hispanic families not only with neighborhood schools but with an incentive to concentrate in that region. This artificial concentration of Hispanic whites, the district court found, in turn prevents the national influx of black families and so contributes to resegregation of Region 2. 460 F.Supp. at 312. To counteract this resegregative trend and to comply with the mandate of this court that inner-city schools be desegregated, the district court ordered the Board to develop a plan for reassigning pupils between schools in Regions 1 and 2.

The Detroit Board advances three reasons the district court's order should be overturned. First, the Board says, the Detroit school system is now unitary and the district court had no authority to order further reassignments. Second, even if the system is not yet unitary, reassigning Spanish-dominant students to Region 1 schools will disrupt State required bilingual educational programs while achieving only token integration. Third, the Board says, Hispanic students cannot be treated as white for desegregation purposes. We deal with these arguments seriatim.

The Board's first argument depends on Judge DeMascio's holdings that "the school district no longer discriminates against black students," and that "its present assignment pattern is free from the vestiges of prior discrimination." 460 F.Supp. at 308. The case is therefore controlled by *Pasadena City Board of Education v. Spangler*, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976), the Board says. *Pasadena* held a district court has no authority to order annual readjustments of attendance zones to compensate for demographic changes

that occur after a racially neutral attendance pattern has been achieved. Since its assignment plan is racially neutral, the Board says, the district court had no authority to order further modification.

The short answer to this argument is that a racially neutral assignment plan does not necessarily achieve a racially neutral attendance pattern. The Board's plan is limited by residential patterns which reflect past discrimination, as well as by district lines and transportation problems. As the Supreme Court recognized in *Swann v. Charlotte-Mecklenburg Board of Education, supra,* 402 U.S. at 28, 91 S.Ct. at 1282:

> The objective is to dismantle the dual school system. "Racially neutral" assignment plans proposed by school authorities to a district court may be inadequate; such plans may fail to counteract the continuing effects of past school segregation resulting from discriminatory location of school sites or distortion of school size in order to achieve or maintain an artificial racial separation. . . . In short, an assignment plan is not acceptable simply because it appears to be neutral.

There are now 66,650 students attending schools in Regions 1, 5 and 8. The remedial measures implemented to date afford none of these students any relief from de jure segregation. Detroit is still far from achieving a racially neutral attendance pattern. This is not a *Pasadena* situation.[4] *See Adams v. United States, supra,* 620 F.2d at 1291 (the failure of the St. Louis Board ever to adopt a desegregation plan to compensate for segregated residential patterns makes *Pasadena* inapplicable).

The Board's second argument is that reassigning Spanish-dominant students to Region 1 schools will disrupt bilingual educational programs while achieving only token integration. Dr. Felix Valbuena, the Director of Bilingual Education for the Detroit school district, testified that reassigning Spanish speaking students currently enrolled in Region 2 bilingual programs would impede the Board's ability to develop a model program and train bilingual teachers; produce fear and anxiety for the students; limit community participation and interest in the schools; produce shortages of qualified bilingual teachers and necessary resource materials; and require the Board to adopt less efficient and effective methods of instruction. In return for this disruption, the Board says only 1600 students will be reassigned, achieving token integration of only five of the thirty-one Region 1 schools.

■ The Board's concern for the continued viability of its bilingual educational programs is commendable. Circumstances permitting, we might well agree that the desegregative benefits would not justify the disruption created by reassigning Spanish-dominant students. Circumstances, however, do not so permit. We agree with the district court that when the choice is between maintaining optimal conditions in a bilingual educational program and desegregating all-black schools, desegregation must prevail. 460 F.Supp. at 312. *See Keyes v. Denver School District No. 1,* 521 F.2d 465, 480 (10th Cir. 1975), *cert. denied,* 423 U.S. 1066, 96 S.Ct. 806, 46 L.Ed.2d 657 (1976).

■ This brings us to the Board's third argument, that Hispanic students cannot be reassigned to desegregate identifiably black schools because such students are themselves minorities. In support of this argument, the Board cites *Keyes v. School District No. 1, Denver, Colo., supra,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973).

In the *Keyes* case, the Supreme Court found the school district's history of discrimination against Hispanic students justified treating those students as minorities for desegregation purposes:

---

4. In light of our holding that Detroit has not yet achieved a unitary system, we need not decide whether the concentration of bilingual programs in Region 2 is having a resegregative effect and, if so, whether that fact standing alone would empower the district court to order additional relief. *See Dayton Board of Education v. Brinkman,* 433 U.S. 406, 420, 97 S.Ct. 2766, 2775, 53 L.Ed.2d 851 (1977) (*Dayton I*); *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

We conclude, however, that the District Court erred in separating Negroes and Hispanos for purposes of defining a "segregated" school. We have held that Hispanos constitute an identifiable class for purposes of the Fourteenth Amendment. . . . Indeed, the District Court recognized this in classifying predominantly Hispano schools as "segregated" schools in their own right. But there is also much evidence that in the Southwest Hispanos and Negroes have a great many things in common. The United States Commission on Civil Rights has recently published two Reports on Hispano education in the Southwest. Focusing on students in the States of Arizona, California, Colorado, New Mexico, and Texas, the Commission concluded that Hispanos suffer from the same educational inequities as Negroes and American Indians. In fact, the District Court itself recognized that "[o]ne of the things which the Hispano has in common with the Negro is economic and cultural deprivation and discrimination," [*Keyes v. School Dist. No. 1, Denver Colorado*], 313 F.Supp. [61], at 69. This is agreement that, though of different origins, Negroes and Hispanos in Denver suffer identical discrimination in treatment when compared with the treatment afforded Anglo students. In that circumstance, we think petitioners are entitled to have schools with a combined predominance of Negroes and Hispanos included in the category of "segregated" schools.

(Citations and footnotes omitted.) 413 U.S. at 197–98, 93 S.Ct. at 2691–2692.

Similarly, the Fifth Circuit has treated Hispanic students as minorities for purposes of school desegregation. *See United States v. Midland Independent School District*, 519 F.2d 60, 63–64 (5th Cir. 1975), *cert. denied*, 424 U.S. 910, 96 S.Ct. 1106, 47 L.Ed.2d 314 (1976); *Tasby v. Estes*, 517 F.2d 92, 106–07 (5th Cir.), *cert. denied*, 423 U.S. 939, 96 S.Ct. 299, 46 L.Ed.2d 271 (1975) and cases cited therein.

The common element justifying treatment of Hispanic students as minorities in the *Keyes, Midland*, and *Tasby* cases was each school system's history of de jure segregation of Hispanos. In *Keyes*, the Supreme Court found "Negroes and Hispanos in Denver suffer identical discrimination." 413 U.S. at 198, 93 S.Ct. at 2692. In the *Midland* case, "[t]he record clearly demonstrate[d] that the Midland School District deliberately segregated Mexican-Americans from Anglos." 519 F.2d at 62. The *Tasby* court found record evidence "to establish the isolation of Mexican-American students in the [Dallas school system] from white students and the [Dallas system's] practice of 'integrating' its Mexican-American students with black students." 517 F.2d at 106. Thus, it appears, in school systems that historically have discriminated against Hispanic students, those students must be grouped with blacks rather than whites for desegregation purposes.

Because there is no indication in the record whether, historically, the Detroit school district has discriminated against Hispanic students, we are unable, on the present appeal, to affirm Judge DeMascio's decision that "for school assignment purposes Spanish-surnamed students cannot be treated differently than other white students." 460 F.Supp. at 312. On remand, the district court is directed to conduct a hearing on that issue.

Our remand for hearing on this issue places the case as an unusual posture. In order for the Board to prevail in its contention that Hispanic students cannot be treated as white, it must prove it practiced de jure segregation of such students. However, doing so would compound the Board's problems because grouping Hispanos with blacks might require revision of the district court's remedial guidelines and a comprehensive review of previously approved assignment patterns, at least in Region 2. This being so, it is possible that the Board may not continue to assert its present position on remand.

Nor is any other party to the present litigation likely to argue there has been de jure segregation of Hispanic students. The position of plaintiffs in the district court

was that concentrating bilingual programs in Region 2 provides neighborhood schools which in turn induce Hispanic families to move there. 460 F.Supp. at 312. The plaintiffs urged that this resegregative effect should be countered by reassigning some Hispanic students to Region 1 schools. Treating Hispanos as blacks for desegregation purposes would, of course, preclude such reassignments since the district court consistently has refused to reassign blacks to identifiably black schools. Thus, the plaintiffs have no incentive to argue Hispanos have been the victims of de jure segregation in Detroit. Similarly, the State of Michigan defendants, who may well have to share the Board's liability for remedial costs if the court finds de jure segregation of Hispanic students, seem unlikely to present evidence of discrimination.

Because none of the existing parties is likely to argue that Hispanic students have been victims of de jure segregation in Detroit, the district court is directed to permit individuals or organizations representing Detroit's Hispanic community to intervene in the remand proceedings for the limited purpose of presenting evidence on this issue. Our opinion in the related case, No. 78–1598, 620 F.2d 1141 (6th Cir. 1980), recognizes the right of LULAC Council No. 11054, and its co-appellants to intervene in these remand proceedings solely on the issue of de jure segregation of Hispanos. Should other individuals or organizations also wish to intervene on behalf of the Hispanic community, the district court will determine under Fed.R.Civ.P. 24 whether their interests are adequately represented by LULAC Council No. 11054 et al.; additional intervenors need not be permitted unless their participation as parties will serve some useful purpose. We emphasize here, as in our opinion in No. 78–1598, that intervention will be limited to the issue of de jure segregation of Hispanic students in the Detroit school system.

Unless the district court finds the defendants discriminated against Hispanic students, it may treat such students as white for desegregation purposes. The court then would be free to order implementation of its previously approved reassignment plan for Hispanic students, or any modification thereof found to be desirable. We suggest, however, that the district court permit LULAC Council No. 11054 et al. to participate as amici curiae in developing a reassignment plan that will achieve the maximum amount of desegregation possible without neglecting the bilingual educational needs of Hispanic students. Before any additional reassignments are implemented, including those contained in the previously approved plan of the district court for transporting Region 2 students to Region 1, they should be tested against the August 15, 1975, guidelines as modified by Part III of this opinion.

Accordingly, the district court's order directing the Board to implement additional pupil reassignments in Regions 1 and 2 is vacated. The cause is remanded for a hearing on the question whether Hispanic students should be treated as white for desegregation purposes and for other action consistent with the outcome of that hearing.

## V

■ The final question we must address is whether Judge DeMascio erred in declining to recuse himself from the remand proceedings in this case. We hold he did not err.

Briefly, the plaintiffs argue Judge DeMascio violated 28 U.S.C. § 455(a) and Canon 3 A(4) of the Code of Judicial Conduct by engaging in various *ex parte* contacts and discussions with court-appointed experts, community groups and representatives of the Detroit Board. In an opinion reported at 426 F.Supp. 929 (E.D.Mich. 1977), Judge DeMascio denied plaintiffs' motion for recusal.

28 U.S.C. § 455(a), as amended,[5] provides:

---

5. Section 455 was amended by the Act of December 5, 1974, Pub.L. No. 93–512, 88 Stat. 1609. Section 1 of that Act substituted the

present subsection (a) for the former version which read:

## § 455. Disqualification of justice, judge, magistrate, or referee in bankruptcy

(a) Any justice, judge, magistrate, or referee in bankruptcy of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

The plaintiffs complain that Judge DeMascio created the appearance of partiality by meeting *ex parte* with the Detroit Board's representatives on August 15, 1975, even before plaintiffs' counsel had received a copy of the court's just filed remedial guidelines, to discuss an impending teachers' strike. The plaintiffs also argue Judge DeMascio engaged in what they term "negotiations" with the Board in developing a desegregation plan, a process from which they were excluded.

Judge DeMascio's opinion denying recusal discusses these complaints and his underlying actions in detail, and we need not recount them here. *See* 426 F.Supp. at 935–39. He characterized the incidents of which plaintiffs complain as "judicial activities designed to ensure a community climate receptive to [the] court's orders." 426 F.Supp. at 939. The so-called negotiation process was designed "to avoid the formality of an order," he said. *Id.* Concluding

that his actions were "well within [his] discretion and were based on substantial precedent," Judge DeMascio held § 455(a) did not require recusal. *Id.*

■ We agree. Although perhaps a bit unorthodox, Judge DeMascio's actions appear to us to have been judicial activities. To make out a case for recusal under § 455(a), a movant must rely on extra-judicial conduct rather than matters arising in a judicial context. *Davis v. Board of School Commissioners of Mobile County, supra,* 517 F.2d at 1052 (construing amended § 455(a) *in pari materia* with 28 U.S.C. § 144, the other federal disqualification statute). *See United States v. Grinnell Corp.,* 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966); *Berger v. United States,* 255 U.S. 22, 31, 41 S.Ct. 230, 232, 65 L.Ed. 481 (1921). Accordingly, we affirm Judge DeMascio's decision that recusal was not required.

The plaintiffs also complain that Judge DeMascio's conduct violated Canon 3 A(4) of the Code of Judicial Conduct:

(4) A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as

"Any justice or judge of the United States shall disqualify himself in any case in which he has a substantial interest, has been of counsel, is or has been a material witness, or is so related to or connected with any party or his attorney as to render it improper, in his opinion, for him to sit on the trial, appeal, or other proceeding therein."

There is agreement among the courts that the purpose of the amendment was to change the standard for recusal from a subjective to an objective one, as well as to overrule the prior concept that close cases involving disqualification should be resolved against recusal on the ground the judge has a duty to sit. *See, e. g., United States v. Cowden,* 545 F.2d 257 (1st Cir. 1976), *cert. denied,* 430 U.S. 909, 97 S.Ct. 1181, 51 L.Ed.2d 585 (1977); *Davis v. Board of School Commissioners of Mobile County,* 517 F.2d 1044 (5th Cir. 1975), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976).

There is a split among the circuits, however, as to whether the amended version of § 455(a), with its objective standard, applies to post amendment proceedings in cases, such as this one, filed before the amendment's effective date. Section 3 of the amending act provided

the amended version "shall not apply to the trial of any proceeding commenced prior to [Dec. 5, 1974] nor to appellate review of any proceeding which was fully submitted to the reviewing court prior to [that date]." The Fourth and Eighth Circuits have held the amended version inapplicable to post amendment proceedings in cases filed before December 5, 1974. *In re Virginia Electric & Power Co.,* 539 F.2d 357 (4th Cir. 1976); *United States v. Dodge,* 538 F.2d 770 (8th Cir. 1976), *cert. denied,* 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 547 (1977). The Fifth Circuit has disagreed. *Potashnick v. Port City Construction Co.,* 609 F.2d 1101 (5th Cir. 1980); *Parrish v. Board of Commissioners of Alabama State Bar,* 524 F.2d 98 (5th Cir. 1975) (en banc), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1977). Judge DeMascio held the amended version of § 455(a) inapplicable in the present case. 426 F.Supp. at 932.

Because we think the actions of Judge DeMascio do not require recusal even under the section as amended, we need not decide which version applies to this case. Rather, we assume for purposes of this decision that the amended version of the statute applies.

authorized by law, neither initiate nor consider *ex-parte* or other communications concerning a pending or impending proceeding. A judge, however, may obtain the advice of a disinterested expert on the law applicable to a proceeding before him if he gives notice to the parties of the person consulted and the substance of the advice, and affords the parties reasonable opportunity to respond.

In addition to his previously described meeting with Board representatives and "negotiations" over the Board's proposed desegregation plans, the plaintiffs argue, Judge DeMascio's use of experts violated Canon 3 A(4). By order of April 15, 1975, Judge DeMascio appointed three educators as experts to assist him in gathering background information, soliciting the views of community groups and educators, and evaluating the Educational Components of the Board's remedial plan. The plaintiffs do not question the court's authority to utilize experts. Rather, they complain the court's experts did not file reports of record and were never subject to cross-examination, but submitted their views *ex parte*.

We do not believe Judge DeMascio's use of experts, or his receipt through them of community and expert views on how best to approach the problems of desegregating Detroit schools, required recusal. We are concerned with the plaintiffs' charge that the reports of these experts were not placed in the record nor made available to the parties. Accordingly, we expressly direct that if any experts are employed to advise the district court on any further matters in this litigation, they shall prepare written reports, copies of which shall become part of the record and shall be made available to all parties or their attorneys.

The remedial phase of this litigation has been protracted and arduous. We recognized in a previous opinion that "District Judge DeMascio was faced with an extremely difficult (if not impossible) assign-ment, confronted as he was with the responsibility of formulating a decree which would eliminate the unconstitutional segregation found to exist in the Detroit public schools, without transgressing the limits established by the Supreme Court." 540 F.2d at 236. Our review of Judge DeMascio's various opinions and orders inclines us not to disagree with District Judge James P. Churchill's assessment[6] of Judge DeMascio's conduct in these remedial proceedings:

It is my opinion that the manner in which Judge Robert E. DeMascio has presided in this case has been exemplary and should command the respect of the parties, counsel, the judiciary, and the public. 426 F.Supp. at 944.

However, in view of the public interest in the instant school desegregation case, the challenge raised by the plaintiffs, and the bitter feelings that have developed, this court suggests that, on remand, the Chief Judge of the District Court for the Eastern District of Michigan reassign this case either to himself or to another appropriate judge.

## VI

It was indicated during oral argument that plaintiffs intend to proceed with their efforts to establish, within the guidelines enunciated by the Supreme Court in *Milliken v. Bradley*, 418 U.S. 717, 744–47, 94 S.Ct. 3112, 3126–28, 41 L.Ed.2d 1069 (1974) (*Milliken I*), a basis for a metropolitan remedy. *See* 540 F.2d at 240; 411 F.Supp. at 937. Our limited affirmances in *Bradley v. Milliken*, 540 F.2d 229 (6th Cir. 1976), and the present appeal are without prejudice to the district court's obligation to proceed with the inter-district litigation, if pursued by the plaintiffs.

On remand, the district court will be empowered to make further alterations in its previously approved remedial plans, as the evidence may require.

---

6. Judge Churchill's comment is taken from his opinion holding, on a question referred to him by the Chief Judge of the district, that Judge DeMascio's conduct had not created the appearance of partiality and so did not require recusal in regard to faculty assignments.

The case is remanded to the district court for further proceedings not inconsistent with this opinion and our previous opinion reported at 540 F.2d 229. No costs are taxed. Each party will bear its own costs on this appeal.