**Walter Stephen JACKSON, et al., Plaintiffs,**

v.

**FORT STANTON HOSPITAL AND TRAINING SCHOOL, et al., Defendants,**

v.

**John E. and Iris YOUNG, legal guardians and parents of Rita Kay Young, et al., Intervenors.**

Civ. No. 87–0839 JP.

United States District Court, D. New Mexico.

Dec. 28, 1990.

Paul L. Biderman, Santa Fe, N.M., Philip B. Davis, Albuquerque, N.M., Robert Levy, Levy and Geer, P.A., Daniel W. Shapiro, Albuquerque, N.M., Timothy M. Cook, Judith A. Gran, Frank Laski, The Public Interest Law Center of Philadelphia, Philadelphia, Pa., Peter Cubra, Marlene Foster, Protection and Advocacy System for New Mexicans with Developmental Disabilities, Albuquerque, N.M., Ann Tilford Sims, Williams, Conroy & Sims, Belen, N.M., Nancy Koenigsberg, Protection and Advocacy System, Albuquerque, N.M., for plaintiffs.

Barbara Bergman, School of Law, University of New Mexico, Albuquerque, N.M., Guardian Ad Litem, for Felicia Botello.

Kent Winchester (Roberta Beyer, of counsel), Albuquerque, N.M., for applicants-in-intervention plaintiffs.

Vernon W. Salvador, Albuquerque, N.M., for intervenors.

Jerry A. Dickinson, Beth W. Schaefer, Patricia E. Bustamante, Sp. Asst. Attys. Gen., Hal Stratton, Atty. Gen., Chris Coppin, Santa Fe, N.M., Joel I. Klein, Paul M. Smith & Rebecca L. Brown, Onek, Klein & Farr, Washington, D.C., for State defendants.

## MEMORANDUM OPINION AND ORDER

PARKER, District Judge.

The subject of this memorandum opinion and order is "Plaintiffs' Motion for Disqualification," filed August 29, 1990. After reviewing the memoranda submitted by the parties in conjunction with the motion, and after consulting the applicable authorities, I conclude that plaintiffs' motion should be denied.

### I. *Background*

This action was filed on July 8, 1987. The case has required numerous proceedings and orders and has involved a multitude of parties and witnesses.[1] After many days of evidentiary hearings on requests for emergency relief beginning in late 1987, the main trial began on October 16, 1989, consuming a total of eight weeks in the following trial segments: October 16-19, 1989; October 30 to November 3, 1989; November 13-16, 1989; December 12-15, 1989; January 2-5, 1990; and April 2-27, 1990. In the course of the trial, many witnesses, most of whom were presented as experts, testified; over eight hundred exhibits were admitted into evidence; and over 10,000 pages of transcripts were recorded.

During the trial I decided that the assistance of a court-appointed expert, with broad expertise in the area of developmental disabilities, would enhance my ability after trial to articulate an opinion based on

---

1. For a more detailed discussion of the history of this litigation and of the parties involved, *see* my opinion on the merits in this case, 5–23, filed concurrently.

the trial evidence.[2] In addition, at the time I was considering appointing an expert, which was before I heard all of the parties' experts testify, I believed it would be useful to have an independent expert available after trial to advise me on whether my conclusions based on the trial testimony and other evidence were professionally understandable and practical.[3] By letter of December 15, 1989, I asked the attorneys to confer and jointly to submit recommendations, or preferably one recommendation, to fill the position. If counsel were unable or unwilling to agree on a joint submission, I requested separate submissions of no more than five recommendations each. Letter to counsel, December 15, 1989.

In early January, 1990 the attorneys conferred but to no avail. In short order, I received three sets of recommendations: defendants provided four nominees, intervenors one, and plaintiffs five, with no common recommendation. The parties offered substantial commentary on their own nominees, as well as on those of the other parties. The defendants and plaintiffs provided lengthy criticisms of one another's selections. I endeavored to select the nominee with the broadest experience who would be the most acceptable to all parties. To that end, I chose Dr. James Foshee, a nominee of the defendants who was then employed as Assistant Commissioner of Mental Retardation Services for the State of Tennessee.

In accordance with my needs, and in consideration of the parties' preferences,[4] Dr. Foshee was an acceptable expert for the duties required of him by the court. Although opposed to Dr. Foshee, the plaintiffs found him to be the least objectionable of defendants' nominees. In discussing those nominees, plaintiffs allowed: "... only one of those individuals even meets the sole criteria [sic] established by the

court; only James Foshee could fairly be called a 'generalist' in the field of developmental disabilities." And further:

> James Foshee comes closest among the four to meeting the criteria plaintiffs have recommended. As assistant commissioner for mental retardation services in the state of Tennessee over the past 14 years he is experienced in administering or contracting for the provision of both institutional and community based services. He can fairly be called a "generalist."

Letter from plaintiffs, January 12, 1990, 2 & 5. Nonetheless, plaintiffs objected to Dr. Foshee for two stated reasons. First, plaintiffs believed that Dr. Foshee's personal and professional relationship with Dr. Carl Haywood, who testified at trial on behalf of the defendants, would inhibit a candid expression of Dr. Foshee's views. Second, they argued that his employment by Tennessee, a state with a relatively high rate of institutionalization, would inhibit his ability or inclination to take positions contrary to that state's practices. *Id.* at 5–6.

In response to plaintiffs' concerns, I interviewed Dr. Foshee by telephone in early February, 1990. After speaking with him at length, I was fully satisfied that he had no predisposition as to the outcome of the case and would have no difficulty taking positions contrary either to those expressed by Dr. Haywood or to the practices of his employer. Regarding this second point, Dr. Foshee also informed me that he was contemplating retirement within the following few months; as it turned out, before Dr. Foshee toured the institutions or engaged in substantive conversations, he had decided to retire, and did retire from his position with the state before his deposition was taken. Finally, I was impressed with

---

**2.** Both the defendants and the intervenors opposed the concept of a court-appointed expert, contending that by the close of all the evidence I would have heard sufficient evidence to render a careful and informed judgment.

**3.** This rather broad mandate, which was reflected in my order appointing Dr. Foshee, filed March 28, 1990, turned out to be broader than I

eventually required. By the end of trial, after I had heard a great deal of expert testimony, the services I called on for Dr. Foshee to provide were quite narrow in scope.

**4.** The intervenors did not nominate Dr. Foshee, but did concur in his nomination. Letter from intervenors, January 12, 1990.

**1234**

Dr. Foshee's willingness to express opinions with frankness and without hesitation. *See* letter to counsel, February 16, 1990. I informed counsel that although Dr. Foshee would not be present for the completion of the trial, he would review the transcripts of the proceeding and would visit both institutions following the completion of the trial. With respect to his role I explained to all counsel: "I plan to call on Dr. Foshee to assist me with technical questions as well as to comment on trial testimony on which I elicit his views." *Id.*

Plaintiffs renewed their objections to the impending appointment of Dr. Foshee. Citing Rule 706(a), plaintiffs also argued that communications between the court and Dr. Foshee must be on the record. Letter from plaintiffs, February 23, 1990, 3.[5]

By order of March 28, 1990 I appointed Dr. Foshee as the court expert. My order, which was modelled after an order[6] submitted by the plaintiffs, directed Dr. Foshee: to investigate and evaluate conditions at the two facilities; to evaluate training received by individually named plaintiffs to determine its adequacy in preventing deterioration of self-care skills; to determine and verify the proper basis of placement recommendations by interdisciplinary teams for individually named plaintiffs; to evaluate the reports and testimony of the expert witnesses of all parties; and to offer testimony after trial, if requested, as to his findings and expert opinions. Additionally, the order granted the parties reasonable opportunity to depose Dr. Foshee after completion of his review, investigation and evaluation and, furthermore, granted the parties the right to cross-examine him on any findings and opinions. Order, filed March 28, 1990. In a letter accompanying the order, I informed the parties: "In regard to plaintiffs' request that communications with Dr. Foshee be made on the

record, the parties should be advised that I plan to communicate with Dr. Foshee by telephone when necessary. Copies of any written correspondence, however, are being placed in the court file." Letter to counsel, March 28, 1990.

After presentation of evidence during April, Dr. Foshee reviewed the trial transcripts and visited the institutions, accompanied by me, my law clerk Laura Cordero, and representatives of all parties.

In response to questions by the parties as to the evidentiary form in which Dr. Foshee would present his findings and what role the parties would play in that process, I advised counsel that I would not be asking Dr. Foshee to prepare an extensive written report. I thought such a request would unnecessarily delay resolution of the case. Letter to all counsel, May 22, 1990. During trial on April 27, 1990, I had asked counsel for suggestions concerning communications between the court and Dr. Foshee. Defendants and intervenors had requested an opportunity to depose him on any opinions rendered to the court pursuant to Rule 706. Plaintiffs had asked that any communications be placed on the record.

In particular, plaintiffs were concerned by my stated intention to speak with Dr. Foshee by telephone. Before engaging in any substantive conversations with Dr. Foshee, I sought to address plaintiffs' concern. I therefore asked all counsel what type of record would adequately inform them of my conversations with Dr. Foshee, which I planned to begin once he had completed his review of transcripts and his visit to the facilities. On April 27, 1990, the following exchange took place between me and the parties, Mr Cerf for the defendants, Mr. Winchester for the intervenors, and Mr. Cubra for plaintiffs:

him for a written report, the parties should have been present while I read it.

**6.** As a sample order, plaintiffs submitted the order appointing the court-appointed expert in *Homeward Bound, Inc. v. Hissom Memorial Center*, No. 85–C–437–E (N.D.Okla. filed March 30, 1986).

**5.** Plaintiffs also made this statement: "To allow Dr. Foshee to give expert testimony out of the presence of the parties would completely violate the due process rights of all the parties to the case." *Id.* I interpreted this statement as another call for on the record communications. I did not believe that plaintiffs meant by this that the parties should listen in on my phone conversations with Dr. Foshee; or that, if I had asked

THE COURT:

* * * * * *

Now I want to address the broader issue of the Court's communications with Dr. Foshee, and tell you that as of this time, although I have had probably a half dozen telephone conversations with Dr. Foshee, I have not met him personally.

The telephone conversations have involved logistical matters almost exclusively. There have been no discussions of any substantive matters other than the question of random selection of certain people who we wanted him in particular to focus on in terms of records review. * * *

And then of course I've asked Dr. Foshee to look at the records of the 13 named Plaintiffs and also two of the subjects of the Foster Tour.

Now, beyond that, I need your suggestions, though, as to what you think appropriate for me to do in conversing with Dr. Foshee about substantive matters in the case. In order to expedite it, I probably am not going to ask him to prepare an extensive written report, and that's, like I say, primarily for time considerations. If you insist on that, we can do that, but it may substantially delay a resolution of the case. So any other suggestions you may have, I'm open to comments.

MR. CERF: I think the rule addresses this with some clarity, and if I'm recalling correctly, the rule simply requires that he be made available for deposition at the election of—

THE COURT: Well, I should state—and I think I've said this before—he will, of course, be made available for deposition.

MR. CERF: Certainly so far as Defendants are concerned, I don't know whether we would exercise that option. I haven't given it considerable thought. But to the extent that he has formed opinions, I think all we would like is an opportunity to find out what those opinions are, whether they come from him orally or through a written report would be sufficient for our purposes.

MR. WINCHESTER: Your Honor, the intervenors basically agree with that. And speaking for the Intervenors, I'm not unduly concerned about the issue of documenting communications between you and your expert, as long as we have an opportunity to find out what his findings are, which is what the rule speaks to. That's all we care about. So it is our position that communications between you and Dr. Foshee do not need to be on the record, and there does not need to be a record of them.

THE COURT: Okay. What is the Plaintiffs' position?

MR. CUBRA: Your Honor, I would like to ask your indulgence, and allow us to discuss this after our next break, because—

THE COURT: Sure. That's fine.

Tr. 4–27–90 at 4–6. The exchange resumed later that day:

THE COURT:

* * * * * *

Let me ask Mr. Cubra, did you have any suggestions about communications between the Court and Dr. Foshee?

MR. CUBRA: Yes, sir. Our thoughts are these: That we would ask you to continue your practice of having no substantive discussions when you're having contact outside of the presence of the parties.

And as to the tour, our thought is that when you wish to ask questions of Dr. Foshee, that you do so in the presence of our observer, and at any time that there are substantive statements by him, that you just arrange for whoever our observer turns out to be to be able to hear them at the same time, and then there's at least some semblance of a record in that fashion. I don't know your plan about that.

THE COURT: It's unlikely that there will be many conversations of substance during the tour. I do want to be in a position, of course, to talk to him, and I need to know what you request in terms of a record of that.

MR. CUBRA: I understand. To the extent that you would like to have conversations with him outside of the context of this tour, we would ask that you make a record that you think will be sufficient for us and others to know the content, at least as to the subjects and so forth, so that then we could use that to refresh his recollection when we do his deposition.

Our first preference is, to the extent you're able to do it, to ask his views when our observers are present.

THE COURT: Okay. All right. . . . Tr. 4–27–90 at 201–02. My clerk and I understood Mr. Cubra's comments to mean that during the upcoming tours of the two facilities, plaintiffs wanted any of our questions of Dr. Foshee to be asked in the presence of the parties' representatives, but that conversations following the tours, which would be by telephone, need not involve representatives of the parties, as long as a record sufficient to identify the content of the conversations was kept for the parties' use at Dr. Foshee's deposition. Confirming my understanding of the exchange on April 27, 1990, I advised counsel by my letter of May 22, 1990 that I had adopted plaintiff's request. I concluded: "I plan to communicate with Dr. Foshee by telephone in the near future. Both my law clerk and Dr. Foshee have made records of the subjects discussed as requested by plaintiffs and will continue to do so. These records will be made available to counsel in advance of Dr. Foshee's deposition." Letter to counsel, May 22, 1990. As of May 22, 1990, Dr. Foshee had not expressed opinions on any substantive issues. To that point the discussions addressed only logistical matters such as which exhibits Dr. Foshee had and would review, the manner in which random selection of records for review would occur, which transcripts had been sent for his review, and his itinerary.

On May 29, 1990 the first of three substantive phone conversations occurred between me and Dr. Foshee. My law clerk,

Laura Cordero, participated in this and in the two subsequent conversations. In preparation for the three conversations, Ms. Cordero and I outlined in detail the areas which I wanted to discuss with Dr. Foshee. During these conversations I expressed many of the conclusions that I had reached based on the presentation of evidence in court. I made no changes to these conclusions by reason of my exchanges with Dr. Foshee. Dr. Foshee served the useful purpose of helping me to articulate, in a more technically precise and effective manner, the components of discharge and transfer plans.

After the first telephone conversation, I received a letter from plaintiffs revising the procedure that I had understood they had requested on April 27, 1990: "Plaintiffs respectfully request that you alter your plan and make a transcription of the conversation." Letter from plaintiffs, May 30, 1990. Plaintiffs argued that their statements of April 27, 1990 should not be construed as a waiver of their earlier request that substantive communications be on the record. *Id.* By that point, however, I had already adopted and put into operation their request of April 27, 1990.[7]

On June 20 and July 2, 1990 I conferred with Dr. Foshee again by phone. After the talks concluded, my clerk and I amended the outline we had previously prepared by adding some items to reflect all subjects discussed during the exchanges and then sent copies to counsel. In my accompanying letter I explained to counsel: "I am confident that the outline I am enclosing will enable all parties to explore fully at a deposition the opinions rendered by Dr. Foshee." Letter to counsel, July 10, 1990.

During the third and final substantive conversation with Dr. Foshee I informed him of my conclusions on an appropriate discharge plan for those individuals whose interdisciplinary teams had recommended community placement. I asked him to help me to articulate my thoughts in a manner

---

**7.** I should further report that Dr. Foshee expressed most of his views during the first conversation on May 29, 1990.

and in a language that would be understandable to professionals involved with the care of the developmentally disabled. On July 6, 1990, Dr. Foshee submitted a letter and two page "draft position" in accordance with my request. Letter from Dr. Foshee, July 6, 1990. At that time I decided not to transmit copies to counsel because I had not decided to adopt the language contained therein and, also, I did not want to divulge my decision on the issues prematurely. I had already met the parties' request that they be sufficiently apprised of the content of the communications by distributing the outline.

The parties moved to depose Dr. Foshee. On July 12, 1990 plaintiffs noticed the deposition of Dr. Foshee for the agreed upon date of July 19, 1990. During my conversation with Dr. Foshee on July 2, 1990, I had asked him if he had taken notes during either his tours of the facilities or his reviews of institutional records. He indicated that he had, and I asked that he take the notes with him to his deposition and make them available to counsel. In order to assist the parties in preparing for the deposition, I asked Dr. Foshee to mail me a copy of his notes so that I could provide counsel with copies. Upon receipt, I mailed copies of the notes to counsel. Letter to counsel, July 16, 1990. I skimmed through the notes to identify them, but never read the notes in detail because they were not material for my purposes.

I am advised that the deposition took place on July 19, 1990. Because Dr. Foshee, as the court's expert, would be available to testify and every party had a right to call him, the parties agreed that the deposition would serve only for discovery purposes and no party would seek its admission into evidence. Stipulation Concerning the Deposition of James G. Foshee, filed July 17, 1990.

Soon after the deposition, I received letters from both defendants and plaintiffs. In a letter dated August 2, 1990, defendants asked for guidance regarding Dr. Foshee's role in the litigation. Defendants, specifically, sought clarification in these areas: (1) whether I would rely on Dr. Foshee as a court-appointed expert, under Rule 706, or as a technical advisor to the court; (2) whether I intended to relay the information received from Dr. Foshee during the phone conversations, and if so, by what evidentiary method; (3) whether the parties would be permitted to offer rebuttal evidence if Dr. Foshee was called to testify; and, (4) whether I intended to inform counsel of the substance of the July 6, 1990 Foshee letter. Letter from defendants, August 2, 1990. With respect to this last issue, apparently Dr. Foshee had advised the parties at his deposition of his July 6 letter to me and said that he was "not at liberty" to divulge its contents. Plaintiffs' Motion for Disqualification at 5. Having never had an opportunity to read the Foshee deposition transcript, I do not know the details of that discussion.

By letter of August 3, 1990 plaintiffs requested that I set a date for them to present rebuttal testimony to the opinions expressed by Dr. Foshee at his deposition. Also, plaintiffs expressed the view that any reliance by me on statements by Dr. Foshee would be inappropriate: "Those statements are prejudicial to the plaintiffs and are based on a review of institutional conditions whose shortcomings are acute." Letter from plaintiffs, August 3, 1990.

By letter of August 8, 1990 I responded to the concerns raised by the parties. First, I informed counsel that Dr. Foshee was serving as a court-appointed expert, not as a technical advisor. Second, I explained that unless one of the parties offered his deposition testimony into evidence, which of course would take concurrence by all parties, I would not rely on any opinions he had expressed; without such concurrence and admission, I would not base my conclusions about liability issues on any opinions or statements Dr. Foshee had conveyed to me. Third, I would not make a decision as to whether rebuttal witnesses could be presented until Dr. Foshee's deposition testimony was in evidence. Of course, at no time was any party barred from calling Dr. Foshee to testify in person, in which case appropriate rebuttal evidence would certainly have been permitted. Finally, regarding Dr.

Foshee's July 6 letter, I explained the conditions under which it had been written, adding: "I found Dr. Foshee's phrasing of my thoughts to be helpful, although I am not certain that I will adopt his suggested wording entirely." Letter to counsel, August 8, 1990.

In light of my foregoing statements, I should make clear why I did not chose to rely on any opinions offered by Dr. Foshee, despite nearly five hours of conversation. First, after hearing hundreds of hours of expert testimony and reading hundreds of pages of expert reports, I had already reached my conclusions in the case. Second, until the parties decided either to call Dr. Foshee to testify or to withdraw the stipulation barring admission of his deposition, I could not rely on his opinions anyway. I informed counsel of this fact three full weeks before plaintiffs filed their motion to disqualify.

Plaintiffs have questioned my ability to ignore or not to rely on opinion testimony not in evidence. By letter of October 29, 1990 plaintiffs assert: "By offering the Court his opinions on nearly all the issues in the case, Dr. Foshee has had a singular opportunity to influence its outcome. The effect of his opinions on the Court simply cannot be undone." Letter from plaintiffs, October 29, 1990. I should note, however, that plaintiffs have been inconsistent on this point. At the same time that they question my use of Dr. Foshee's services, plaintiffs themselves have asked and expected me to distinguish between inadmissible expert opinions and admissible factual evidence presented in a report by plaintiffs' expert Dr. Ray Foster. *See* plaintiffs' exhibit 228. In large part, the report, which is approximately 200 hundred pages in length, is not separated into factual findings (which I ruled were admissible) and hearsay expert opinions (which I ruled were inadmissible).[8] Distinguishing between the two required interpretation of certain language in the report and the exercise of discretion in sorting out fact from opinion. Notwithstanding this, plaintiffs assumed I would be able to make such a distinction. Necessarily, I had to read a lot of inadmissible opinions in plaintiffs' expert's report in order to accomplish this task. If I could consider a voluminous report from plaintiffs' expert and focus only on the admissible portions while ignoring and not being influenced by the inadmissible expert opinions, I am confident, likewise, that I could avoid being influenced by the oral opinions of Dr. Foshee.

After receiving my letter of August 8, 1990, defendants advised me that they would not be calling Dr. Foshee to testify: "Given the already voluminous record, we doubt that further testimony of any kind would materially assist the Court in its deliberations." Letter from defendants, August 20, 1990. Although defendants noted that they would not object if one of the parties moved the admission of the Foshee deposition, the parties had not agreed to do so.[9] *Id.*

Soon after, plaintiffs filed their motion to disqualify on August 29, 1990. After plaintiffs' motion was fully briefed, I convened a telephone conference of all counsel on October 18, 1990. Among those issues discussed, the question of the sufficiency of the parties' apprisal of the contents of the three communications between Dr. Foshee and the court consumed most of the discussion. Although I did not rely on any opinions or statements of Dr. Foshee in deciding the issues of the case,[10] I asked the

---

**8.** The parties tried to agree which parts of the report are factual findings and which are opinion, but because of frequent disagreement, they left large portions of the report for the court to make the proper designation.

**9.** On this subject defendants stated:
    At present, however, a stipulation between the parties precludes such submission. I am authorized to represent that intervenors would be willing to withdraw the stipulation, as would defendants. Plaintiffs, however, prefer

to adhere to it, as is their right. Accordingly, it appears that the Court will be spared several hundred additional pages of material to review.
    *Id.*

**10.** I had already informed all the parties I would not rely on the conversations in making substantive determinations without admission into evidence of Dr. Foshee's findings and opinions. *See* Letter to counsel, August 8, 1990.

parties if they wanted copies of all the notes of the exchanges that both I and my law clerk had taken during our discussions with Dr. Foshee. If I were ever to have relied on any information from the conversations with Dr. Foshee, those notes contained the full extent of my knowledge of, and even my selection and interpretation of, that information.

Plaintiffs, however, declined my offer of production. Although, they stated that the deposition of Dr. Foshee was comprehensive and sufficiently apprised the parties of the substance of the court's conversations with the court-appointed expert, plaintiffs argued that only their presence during the phone conversations would have made those conversations unobjectionable. Tr. 10–18–90 at 16–17. Contrary to plaintiffs' earlier requests either of April 27, 1990, which sought only a record that would be sufficient to apprise the parties of the contents of the conversations, or of May 30, 1990, which requested that all communications be on the record, plaintiffs here asserted that the existence or not of a record was not the problem, anymore. For the plaintiffs, Judith Gran stated:

> Your Honor, the problem is not that we do not have a record of that....
>
> But the basic problem, the fundamental problem and the fundamental due process issue that was raised by the Court's conversations with Dr. Foshee is that they took place out of the presence of the parties and, therefore, a witness had the opportunity to influence the Court out of the hearing of the parties and influence the outcome of the case.

Tr. 10–18–90 at 6. After hardly mentioning anything previously about being present during the conversations, plaintiffs had once more changed their minds. All of a sudden party presence was the "fundamental" issue. It is interesting to note that this change of focus occurred almost simultaneously with my offer to provide the most thorough record in existence, the notes taken by me and my law clerk.

During the October 18, 1990 telephone conference call, the subject of Dr. Foshee's July 6, 1990 letter came up again. I again indicated its technical purpose, but in order to put to rest the unflagging concern over its content, sent copies to counsel shortly thereafter. Letter to counsel, October 22, 1990.

In the six months that have followed my last conversation with Dr. Foshee, none of the parties have called him to testify, and plaintiffs have not withdrawn their stipulation, which prevents admission of his deposition testimony. If either of these two options had been exercised, I would have postponed my decision of the issues in this case, until all additional evidence, including appropriate rebuttal, had been heard and considered. Oddly, plaintiffs have avoided all opportunities either to correct or to supplement their perceived shortcomings in the evidentiary record or procedure. They have not called Dr. Foshee to testify as a witness. Additionally, they declined to accept my notes or those of my law clerk of the telephone conversations with Dr. Foshee, the best record of those conversations and the only information on which I could have relied if that had been my purpose. But, as I have stated, I have not been influenced by nor have I relied on any findings or opinions relayed to me during those exchanges by Dr. Foshee, just as I have not been influenced by the inadmissible opinions I read in plaintiffs' expert's report.

## II. *Discussion*

As the legal basis for their disqualification motion, plaintiffs cite 28 U.S.C. § 455(a). This section provides: "Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Accordingly, the Tenth Circuit has stated:

> In determining whether a judge should recuse under § 455(a), the issue is not whether the judge is impartial in fact, but rather, whether a reasonable man might question his impartiality under all circumstances.

*United States v. Gigax*, 605 F.2d 507, 511 (10th Cir.1979). *See Hinman v. Rogers*,

831 F.2d 937, 939 (10th Cir.1987). The judge him- or herself is in the best position to apply this objective standard and must in the first instance determine whether to grant a recusal motion: "In deciding whether to recuse himself, the trial judge must carefully weigh the policy of promoting public confidence in the judiciary against the possibility that those questioning his impartiality might be seeking to avoid the adverse consequences of his presiding over the case." *In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1312 (2nd Cir.1988), *reh'g denied*, 869 F.2d 116 (2nd Cir.1989), *cert. denied*, 490 U.S. 1102, 109 S.Ct. 2458, 104 L.Ed.2d 1012 (1989). Equally as important as a judge's disqualifying himself or herself when circumstances so warrant, therefore, is a judge's refusing to disqualify when they do not. In *Hinman* the Tenth Circuit noted: "There is as much obligation for a judge not to recuse when there is no occasion for him to do so as there is for him to do so when there is." 831 F.2d at 939. *See United States v. Bray*, 546 F.2d 851, 857 (10th Cir.1976); *In re Drexel*, 861 F.2d at 1312.

One reason there is as much of an obligation to deny a recusal motion as there is to grant it is the potential for abuse of § 455(a) by litigants who anticipate an unfavorable result. The legislative history of § 455(a) makes clear that judges should be careful not to permit such abuse:

> ... in assessing the reasonableness of a challenge to his impartiality, each judge must be alert to avoid the possibility that those who would question his impartiality are in fact seeking to avoid the consequence of his expected adverse decision. Disqualification for lack of impartiality must have a *reasonable* basis. Nothing in this proposed legislation should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him into a "reasonable fear" that the judge will not be impartial. Litigants ought not have to face a judge where there is a reasonable question of impartiality, but they are not entitled to judges of their own choice.

H.R.Rep. No. 93–1453, House Judiciary Committee, 93rd Cong., 2d Sess., 1974 U.S. Code Cong. & Admin.News 6351, 6355. *See In re Drexel*, 861 F.2d at 1312–13. Examining congressional intent in enacting § 455(a), the Tenth Circuit concluded: "... section 455(a) must not be so broadly construed that it becomes, in effect, presumptive, so that recusal is mandated upon the merest unsubstantiated suggestion of personal bias." *United States v. Hines*, 696 F.2d 722, 729 (10th Cir.1982). *See Varela v. Jones*, 746 F.2d 1413, 1416 (10th Cir. 1984).

With the above considerations in mind, I conclude as follows.

### A. *Impartiality Not Reasonably in Doubt*

■ I find that my impartiality in this case is not reasonably in doubt. As the standard for determining impartiality is an objective one, the conduct complained of must be such that a reasonable person would doubt my impartiality under the circumstances. This test "... assumes that a reasonable person knows and understands all the relevant facts." *In re Drexel*, 861 F.2d at 1313 (emphasis omitted). In *United States v. Grinnell Corp*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966), the Supreme Court rejected a motion to disqualify the trial judge for personal bias and prejudice, stating: "The alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *Id.* at 583, 86 S.Ct. at 1710. The Tenth Circuit has adopted this approach in examining § 455(a) recusal motions. *United States v. Page*, 828 F.2d 1476, 1481 (10th Cir.1987), *cert. denied*, 484 U.S. 989, 108 S.Ct. 510, 98 L.Ed.2d 508 (1987). For disqualification, the *Grinnell* approach requires that the alleged impartiality both arise from an extrajudicial source and effectuate a decision not based on the judge's participation in the case. I conclude that neither one of these requirements is met in this case, and that, accordingly, plaintiffs have failed to allege facts sufficient to show that a rea-

sonable person would suspect me of bias. *See Page*, 828 F.2d at 1481.

The first requirement is not satisfied if the alleged partiality stems from a judicial activity: "To make out a case for recusal under § 455(a), a movant must rely on extra-judicial conduct rather than matters arising in a judicial context." *Bradley v. Milliken*, 620 F.2d 1143, 1157 (6th Cir. 1980), *cert. denied*, 449 U.S. 870, 101 S.Ct. 207, 66 L.Ed.2d 89 (1980).[11] The three telephone conversations between me and Dr. Foshee, however, did arise in a judicial context. Dr. Foshee was the court-appointed expert and served in a manner approved, so I understood, by the parties. In *Bradley* the court held that the district judge was not required to recuse himself in spite of his *ex parte* discussions with court-appointed experts, community groups, and representatives of the defendant school board: "Although perhaps a bit unorthodox, Judge Demascio's actions appear to us to have been judicial activities." *Id.* at 1157.[12] By contrast, the majority of the cases upon which plaintiffs primarily rely in support of their motion for disqualification involve personal contacts and not judicial conduct. *See, e.g., Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988) (conflict between judge's fiduciary interest and the resolution of issues in the case); *Roberts v. Bailar*, 625 F.2d 125 (6th Cir.1980) (judge personally knew defendant and expressed ardent sentiments about his character); *Potashnick v. Port City Constr. Co.*, 609 F.2d 1101 (5th Cir.1980), *cert. denied*, 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980) (judge had personal relationship with attorney for one of the parties).

Furthermore, the cases cited by plaintiffs that do involve judicial activity are not persuasive. In two of the cases the trial judge had engaged in *ex parte* communications with the court-appointed expert. *See United States v. Green*, 544 F.2d 138 (3rd Cir 1976), *cert. denied*, 430 U.S. 910, 97 S.Ct. 1185, 51 L.Ed.2d 588 (1977); *United States v. Weathers*, 618 F.2d 663 (10th Cir.1980), *cert. denied*, 446 U.S. 956, 100 S.Ct. 2927, 64 L.Ed.2d 814 (1980). In both of these criminal cases the defense sought reversal under due process grounds, but the respective courts of appeals affirmed the convictions, holding that the *ex parte* contact had not violated the defendants' due process rights. In *Green* the court noted that while the judge should avoid *ex parte* communications with anyone associated with the trial, including his own appointed expert, failure to do so did not warrant reversal: "We note that every *ex parte* communication to the trial court does not require reversal, especially when there has been a subsequent opportunity to cross-examine the declarant concerning such communication and a failure to object at trial to the procedure used." 544 F.2d at 146, n. 16. As I have indicated, plaintiffs were afforded the opportunity to cross-examine Dr. Foshee and had acceded to the procedure I followed in communicating with him. In *Weathers* the court ruled that the trial judge's sua sponte appointment of an independent expert was harmless error, if at all, inasmuch as the judge did not rely on the post-trial expert reports. In coming to this conclusion, the court emphasized that the judge learned nothing from the post-trial reports that had not already been presented at trial. 618 F.2d at 664. In neither *Weathers* nor *Green* had the trial judge heard the great volume of expert testimony that I did in this case. By the time I talked to Dr. Foshee, he said nothing of substance that I had not already heard and considered.[13]

---

**11.** The Tenth Circuit has recognized an exception to the requirement of extra-judicial conduct, when "... 'such pervasive bias and prejudice is shown by otherwise judicial conduct as would constitute bias against a party.'" *United States v. Page*, 828 F.2d at 1481 (quoting *Davis v. Board of School Commissioners of Mobile County*, 517 F.2d 1044, 1051 (5th Cir.1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188

(1976)). This exception is inapplicable under the facts at bar.

**12.** I should note that my exchanges with Dr. Foshee, if they were *ex parte*, were a lot less so than the discussions in *Bradley*.

**13.** The other cases plaintiffs cite in support of the proposition that avoidance of *ex parte* com-

In addition to the requirement of extra-judicial conduct, plaintiffs must also show that a reasonable person would suspect that my opinion on the merits is not based on what I learned through my participation in the case. *See United States v. Page*, 828 F.2d at 1481. While a determination of the satisfaction of this requirement must be made in accordance with an objective standard, the judge's stated intentions or reliances are not irrelevant. In *United States v. Van Griffin*, 874 F.2d 634 (9th Cir.1989), the court noted that a reasonable person could consider an "emphatic declaration" by the judge as to the proper basis of his decision: "Absent a basis for believing that Magistrate Sattler had any reason to lie, a reasonable person would not doubt his denial that he had in any way examined the incident report that was on the bench as he conducted the trial of Griffin." *Id.* at 637. Therefore, the court held that possession of the report during trial did not create an appearance of bias and that recusal was unwarranted on that ground.[14] *Id.* See also *Price Brothers Co. v. Philadelphia Gear Corp.*, 649 F.2d 416, 420–21 (6th Cir.1981), *cert. denied*, 454 U.S. 1099, 102 S.Ct. 674, 70 L.Ed.2d 641 (1981) (after law clerk gave report of off-the-record observations, statement of judge and testimony of clerk as to the limited purpose of the report overcame any specter of prejudice).[15]

I find that a reasonable person, apprised of all the relevant facts, would not doubt that my opinion on the merits is based solely on my participation in this case. Neither my actions nor my statements could reasonably give rise to an objective claim of impartiality. Finally, an objective observer, in assessing whether I have been partial to plaintiffs' opponents, would undoubtedly note that, in the main, I ruled in favor of the plaintiffs and granted them very significant relief.

### B. *Waiver by Plaintiffs*

Looking back on the many statements plaintiffs have made on the subject of the court-appointed expert, there is enough variation and inconsistency to perplex even the most insightful of decisonmakers. Depending on which of several plaintiffs' attorneys was addressing the court and at which point in the proceedings the comment was made, plaintiffs expressed at least three positions on how my telephone conversations with Dr. Foshee should be conducted. This spectrum ranged from requesting merely a record sufficient to identify the content of the conversations, to a formal stenographic transcription, to actual presence by the parties during the exchanges. Taken together these expressions of plaintiffs' position on this matter have little coherence.

However, at the time I asked for a clear statement of all the parties' positions on the manner by which I should conduct the conversations, plaintiffs answer *was* coherent. It was at this critical juncture, the last day of trial and, also, the last discussion of the subject prior to the commencement of the conversations, that I looked to plaintiffs for guidance. After being given

---

munications is mandatory likewise do not address the issue of recusal, but rather that of due process in criminal cases. *See In re Paradyne Corp.*, 803 F.2d 604 (11th Cir.1986); *United States v. Anderson*, 798 F.2d 919 (7th Cir.1986). Moreover, in *Anderson*, the court specifically defined the term *"ex parte"* to mean "without the other party," concluding that an *"ex parte"* proceeding, therefore, is any judicial proceeding at which only one party is present." 798 F.2d at 923. Under this definition, my conversations with Dr. Foshee may not even constitute *ex parte* communications.

14. The court did question the magistrate's refusal to recuse himself after he did not give assurances that when he subsequently retained the report he did not examine it. Nonetheless, the

court ruled the error harmless and upheld the magistrate's decision not to disqualify himself. *Id.*

15. Plaintiffs cite *Hall v. Small Business Admin.*, 695 F.2d 175, 180 (5th Cir.1983), to support their contention that my assurances are immaterial. In *Hall*, a magistrate's law clerk continued working on a matter after accepting employment with a firm representing one of the parties. As the Seventh Circuit noted in discussing *Hall*, rather than being viewed as a case involving the appearance of impropriety, it is best understood as a case of actual bias (of the clerk) imputed to the court. *United States v. Murphy*, 768 F.2d 1518, 1539 & n. 3 (7th Cir.1985), *cert. denied*, 475 U.S. 1012, 106 S.Ct. 1188, 89 L.Ed.2d 304 (1986).

further time to consider the issue, Mr. Cubra answered: "... we would ask that you make a record that you think will be sufficient for us and others to know the content, at least as to the subjects and so forth, so that then we could use that to refresh his recollection when we do his deposition." Tr. 4–27–90 at 202. This was the statement on which I relied. Had plaintiffs' request been another, the procedure I followed would have been appropriately different.

▮ I conclude that plaintiffs' statements in response to my request for guidance on April 27, 1990 constituted a waiver of the grounds on which they herein seek recusal under § 455(a). Section 455(a) may be waived by the parties after full disclosure. *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1527 (11th Cir.1988), *cert. denied*, 490 U.S. 1066, 109 S.Ct. 2066, 104 L.Ed.2d 631 (1989). Not only did I disclose to the plaintiffs the procedure I would follow, but I also asked plaintiffs to participate in determining that procedure. When a party learns the very facts that form the basis of a disqualification motion and allows the proceedings to go forward without moving to disqualify at that time, the party is deemed to have waived the claim. *United States v. Nobel*, 696 F.2d 231, 236 (3rd Cir.1982), *cert. denied*, 462 U.S. 1118, 103 S.Ct. 3086, 77 L.Ed.2d 1348 (1983). *See In re Muller*, 851 F.2d 916, 919 (7th Cir.1988).

▮ In addition, I find that plaintiffs waived their right to seek my recusal because they did not file their motion in a timely manner. It was not until several months had passed and after plaintiffs had deposed Dr. Foshee that plaintiffs filed the motion to disqualify. To be timely, a motion to recuse "... must be filed promptly after the allegedly disqualifying facts are discovered." *Hinman v. Rogers*, 831 F.2d at 938. *See Singer v. Wadman*, 745 F.2d 606, 608 (10th Cir.1984), *cert. denied*, 470 U.S. 1028, 105 S.Ct. 1396, 84 L.Ed.2d 785 (1985); *United States v. Slay*, 714 F.2d 1093, 1094 (11th Cir.1983), *cert. denied*, 464 U.S. 1050, 104 S.Ct. 729, 79 L.Ed.2d 189 (1984). *See also Willner v. University of Kansas*, 848 F.2d 1023, 1028–29 (10th Cir.

1988), *cert. denied*, 488 U.S. 1031, 109 S.Ct. 840, 102 L.Ed.2d 972 (1989).

IT IS THEREFORE ORDERED that Plaintiffs' Motion for Disqualification is denied.