**CLARKCO LANDFILL COMPANY,**
Plaintiff,

v.

**CLARK COUNTY SOLID WASTE MANAGEMENT DISTRICT,**
et al., Defendant.

No. C–3–98–251.

United States District Court,
S.D. Ohio.

Sept. 11, 1998.

---

Charles Joseph Faruki, Jeffrey T. Cox, Faruki Gilliam & Ireland, Dayton, OH, for Clarkco Landfill Co.

Joseph A. Gregg, Eastman & Smith, Toledo, OH, for Clark County Solid Waste Management Dist., Clark County Ohio Bd. of Com'rs, Roger D. Tackett, James E. Sheehan, John H. Detrick, W. Darrell Howard, Jeffry L. Johnson.

Thomas Edward Trempe, Clark County Prosecutor—3, Springfield, OH, for German Township Trustees.

## DECISION AND ORDER DENYING MOTION FOR DISQUALIFICATION

MERZ, United States Magistrate Judge.

 This action is before the Magistrate Judge on the Clark County Defendants' Motion for Disqualification, filed August 31, 1998. Although the moving Defendants seek what might be called "pre-referral recusal," the Motion does not seek merely an advisory opinion, in that Chief Judge Rice has expressly "reserved the right to refer the captioned cause to United States Magistrate Judge Michael R. Merz for pretrial management." Nor is the Motion premature in that, as the moving Defendants note, motions to dismiss and for abstention will shortly be at issue and that would be a likely time for Chief Judge Rice to consider referral [1]. By making the Motion now, the moving Defendants assure that any party's objections to the Magistrate Judge's decision on recusal will be before Chief Judge Rice when he considers whether or not to refer the matter. Likewise, it is quite correct to address a motion to recuse or disqualify in the first instance to the judicial officer sought to be disqualified.

## ASSERTED FACTUAL BASES FOR DISQUALIFICATION

The moving Defendants set out six sets of circumstances which they believe create an appearance of partiality [2]. Four relate to my

---

1. The moving Defendants are inaccurate, however, in their surmise that "it is likely that the parties will not know whether a matter is referred to Magistrate Judge Merz until after a report and recommendation is made" (Motion, p. 2), since all referrals to the magistrate judge at Dayton are, as is required by the Magistrates' Act, made by written order served on the parties.

2. While this section of their Motion is captioned "Factors That Create the Appearance of Impartiality," their meaning is clear.

representation of various parties while in private practice; one relates to my association in practice with attorney Charles J. Faruki, Plaintiff's counsel in this action; and one relates to some of my proposed findings of fact in the related earlier case, *Danis Clarkco Landfill Co. v. German Township Trustees*, C–3–96–481. I shall deal first with the facts related to my private practice and then with the related case.

I was graduated from law school in June, 1970, and immediately joined the Dayton law firm of Smith & Schnacke as an associate. For the first two years I rotated in various assignments among different partners, doing such varied tasks as private foundation compliance with the Tax Reform Act of 1969, international patent licensing, and securities regulation work for The Mead Corporation, Smith & Schnacke's principal client. The firm had thirty-five attorneys when I joined it, making it by far Dayton's largest firm at the time.

At sometime in 1972, the firm having continued to grow, it was loosely organized into "teams" and I was assigned to the team "captained" by attorney Jon M. Sebaly. Over the next five years, the team consisted of a number of lawyers, including William Compton, Peter Kuntz Graves, and Peggy L. Bennington, but not Mr. Faruki, although he joined the firm during that time. The team handled mostly commercial litigation (concentrating in antitrust work for both plaintiffs and defendants), but did some general business work for some clients. The firm continued to grow, reaching over seventy lawyers by the time I left in 1977. Towards the end of that period, Mr. Sebaly became general counsel to both the Copeland Corporation and Beverage Management, Inc., and expanded his team to include more business practitioners, but Mr. Faruki was never a member of that group, working instead with attorneys Armistead W. Gilliam, Jr., and Paul Horstman to form the firm's commercial litigation team.

At Smith & Schnacke, as I presume is common with most firms, lead responsibility for a client was taken by the "billing partner" who ordinarily assigned the client's work to various lawyers or teams of lawyers within the firm. Danis Industries Corporation, as I believe it was then called, was the client of attorney Albert M. Sealy and he assigned the client's work. Danis' principal and oldest business was commercial and highway construction; I was never assigned any work arising from that side of the business because my father worked for a competitor, Shook Construction. However, over time, I was assigned a number of matters relating to Danis' "trash" business, mostly litigation, but some business acquisition work. My principal client contacts were Mr. Harry van Matre and Mr. Arthur Dudzinski, both of whom left Danis and the Dayton area many years ago.

One matter I handled with Mr. Sebaly for Danis was the Harrison Township trash collection matter. The Trustees of Harrison Township, Montgomery County, decided to "governmentalize" the collection of trash and award a single contract to one hauler, thereby eliminating the private haulers who had had the business. Blaylock Trucking Company, a wholly-owned Danis subsidiary, was the successful bidder. Two lawsuits followed, one by the displaced haulers and one by citizens who insisted they had a constitutional right to contract with the trash hauler of their choice. *DeAngulo v. Board of Trustees*, referenced by the moving Defendants, was the second of these. Contrary to the moving Defendants' characterization (Motion, p. 4, ¶ 4), in both of these cases, I was defending, not challenging, the township's ordinance governing waste collection. Both cases were, as I recall, dismissed on defendants' successful summary judgment motions.

I also represented North Sanitary Landfill, Inc., another Danis subsidiary, in its efforts to construct a sanitary landfill in Clay Township, Montgomery County. The Montgomery County Commissioners attempted to prevent construction because at that time they were attempting to maintain a monopoly on trash dumping in the county at the north and south incinerators which they had constructed; as I recall, paying the revenue bonds depended on "tipping" fees as the incinerators. On behalf of North Sanitary, Smith & Schnacke brought suit in the Montgomery

County Common Pleas Court to appeal under Ohio Revised Code Chapter 2506 from their denial of a required approval. The trial judge granted North Sanitary's motion for summary judgment and found that the County Commissioners' decision was "unconstitutional, illegal, arbitrary, capricious, unreasonable, and unsupported by the preponderance of substantial, reliable, and probative evidence on the whole record" presented to the Commissioners—in other words, on every ground permitted by Ohio Revised Code § 2506.04. The assigned trial judge was The Honorable Walter Herbert Rice, then a Judge of the Montgomery County Common Pleas Court. He was reversed by the Court of Appeals and the Ohio Supreme Court refused jurisdiction.

It is now twenty-two years later. The County Commissioners in question have all long since left office[3]. Judge Rice has been gone from the Common Pleas bench for over eighteen years. The assistant county prosecutor who defended the case has since been elected to the bench, served a distinguished career, and retired. All the Court of Appeals judges who heard the case have retired. With all that change, however, the moving Defendants suggest one thing hasn't changed, my opinion on the power of a county solid waste district to approve or disapprove a sanitary landfill, assuming the position I took represented my personal opinion rather than the position I advocated on behalf of my client.

Although the moving Defendants are correct about my involvement in the *North Sanitary* and *DeAngulo* cases, they have been misled by inaccurate reporting about my involvement in *Roberts v. Williams*. This was a proceeding before the Ohio Environmental Board of Review on appeal from the Ohio EPA Director's issuance of a permit to North Sanitary for the same proposed Clay Township landfill which was at issue in *North*

*Sanitary v. County Commissioners.* At the time of the litigation with the County, the Ohio EPA had either issued a permit or at least very strongly indicated its approval of the site. I did initially appear before Ohio EBR on the appeal, but withdrew long before the EBR issued its March 15, 1978, opinion which shows me as counsel of record. I had become a full-time Judge of the Dayton Municipal Court on July 2, 1977, and was no longer engaged in the practice of law. It may be that the appearance of counsel was not properly changed, but in fact the representation was carried on by Mr. Robert Maynard, who was captain of Smith & Schnacke's environmental team[4], and Mr. Peter Graves; their appearances are reflected in the Franklin County Court of Appeals opinion which is part of Exhibit C attached to the Motion.

The moving Defendants also note that Mr. Herbert Eagon served as North Sanitary's primary technical expert in the 1970's and hypothesize that I may know him or have consulted with him. I do not believe I have ever met Mr. Eagon; I am certain I never consulted with him on behalf of North Sanitary or any other Danis entity. If he was involved with the North Sanitary landfill venture in Clay Township, it was probably with Mr. Maynard, as I was not involved in the technical side and did not participate in trying to obtain a permit.

The moving Defendants point out that North Sanitary operated the Tremont landfill facility, which is adjacent to the site currently in litigation. I was never involved with that portion of North Sanitary's business; my representation of North Sanitary[5] was limited, to the best of my recollection, to the Clay Township matter.

Aside from my representation of two Danis subsidiaries in the 1970's, the moving Defendants point out that Mr. Faruki and I were

---

**3.** Since the North Sanitary suit, two Montgomery County Commissioners, Ray Wolfe and Oscar Page, have been indicted, convicted, and sentenced for accepting bribes from a Danis competitor in the trash hauling business while trustees of Miami Township, Montgomery County. Only Mr. Wolfe was a County Commissioner during the North Sanitary trial stage, Mr. page having been elected in November, 1976.

**4.** Mr. Maynard later became Director of Ohio EPA during the Celeste Administration.

**5.** I am assuming continuity of corporate names within the Danis business; I have no way of verifying that continuity, however.

associates together at Smith & Schnacke for several years. The relevant facts are that Smith & Schnacke was a large institutional firm with little intrafirm socializing. Mr. Faruki and I were not close and did not, to the best of my recollection, work on any cases together.

Moving from the facts of the mid–70's to the facts of the late 90's, I did preside over the preliminary injunction hearing in *Danis Clarkco Landfill v. Trustees of German Township*, C–3–96–481, and wrote a report which was adopted by District Judge Dlott. Although the moving Defendants were not parties to that litigation, both sides there presented facts relating to the chronology of development of the proposed site which involved the Clark County Solid Waste District and some reference to those facts was indeed made in Report.

## ANALYSIS

■ Disqualification of federal judicial officers is, as the moving Defendants note, governed by 28 U.S.C. § 455[6] which provides in pertinent part:

(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

(2) Where in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it;

(3) Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the pro-

ceeding or expressed an opinion concerning the merits of the particular case or controversy;

(4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

(5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(i) Is a party to the proceeding, or an officer, director, or trustee of a party;

(ii) Is acting as a lawyer in the proceeding;

(iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

(iv) Is to the judge's knowledge likely to be a material witness in the proceeding.

The disqualification statute is in service of every litigant's core Due Process right to a neutral and detached judge. The standard applied in evaluating recusal motions is an objective one. "[W]hat matters is not the reality of bias or prejudice, but its appearance." *Liteky v. United States*, 510 U.S. 540, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). A federal judicial officer must recuse himself or herself where "a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned. This standard is not based 'on the subjective view of a party,'" no matter how strongly that subjective view is held. *United States v. Nelson*, 922 F.2d 311 (6th Cir.1990), *cert. denied*, 499 U.S. 981, 111 S.Ct. 1635, 113 L.Ed.2d 731 (1991); *Hughes v. United States*, 899 F.2d 1495 (6th Cir. 1990), *cert. denied*, 498 U.S. 980, 111 S.Ct. 508, 112 L.Ed.2d 520 (1990); *Wheeler v.*

---

6. When Congress adopted § 455 in 1974, it did not repeal the older 28 U.S.C. § 144 which still provides a statutory basis for disqualification. That statute is not relied on here.

*Southland Corp.*, 875 F.2d 1246 (6th Cir. 1989); *Browning v. Foltz*, 837 F.2d 276, 279 (6th Cir.1988), *cert. denied sub nom Browning v. Jabe*, 488 U.S. 1018, 109 S.Ct. 816, 102 L.Ed.2d 805 (1989). Review is for abuse of discretion. *Wheeler.* Where the question is close, the judge must recuse himself. *Roberts v. Bailar*, 625 F.2d 125, 129 (6th Cir. 1980).

In applying the "reasonable observer" test a judge must think like a judge—he or she must adjudicate the motion and not rely on the deceptively simple proposition that because some party has raised a question of partiality, there must be some reasonable basis for it[7]. Litigants file motions to recuse as a self-interested[8] means of forum shopping. For whatever reason, they want a different judge and a motion to disqualify is one way to get a different judge. It is easy for a judge to say "Someone doesn't want me on this case; let some other judge decide it." But § 455 does not create a convenience standard or a peremptory challenge mechanism.

For particular facts to prove or even suggest partiality, they must yield a principle which can be applied to other situations impersonally, i.e., without regard to the identity of the judge or the parties. In the analysis which follows, I will try to infer the relevant principle from the facts which moving Defendants see as disqualifying, and try to apply them generally to other sets of facts frequently faced by judges.

Moving Defendants' example of the North Sanitary and Blaylock litigation suggests that a judge is permanently[9] disqualified from deciding cases involving prior clients. Such a principle would essentially make all prosecutors permanently ineligible for judicial service at least in criminal cases. They also

point out that in the North Sanitary case I advocated a position against a particular kind of local government control of landfills. Generalizing that principle would disqualify all prosecutors and public defenders. Indeed, it may reasonably be predicted that any judge who was a litigator before taking the bench will be required at some time during his or her career to decide an issue on which he or she took sides as a lawyer. Moving Defendants' principle would disqualify most former trial attorneys from judicial service. For example, neither a plaintiffs' personal injury attorney nor insurance company defense counsel could ever sit as a judge in an automobile accident case. Such a principle would require a radical restructuring of the American judiciary.

Moreover, I believe the general public understands that lawyers and judges have different roles and that lawyers advocate positions on behalf of clients which, as judges, they might not hold themselves or think is the best reading of the law. To put it another way, the public understands lawyers are not so identified with the positions they take in litigation that they cannot thereafter be neutral about those positions.

If anything, the general public might think a judge would be more attached to the groups and interests with which he chooses to associate, rather than those he was compelled to represent as a trial attorney. But consider the results: I am a lifelong resident of the City of Dayton and my family has lived here for five generations; should I recuse myself in cases where the City is a litigant? I am a Roman Catholic. Should I remove myself from all death penalty cases[10]? I am a registered Republican. Would the reasonable observer expect me to remove myself from cases where public officials of one Party or the other are parties?

**7.** Flamm, Judicial Disqualification, § 24.2.1 (1996).

**8.** Of course, all acts of parties in litigation are self-interested. An attorney who makes a motion which is in the interest of an opposing party and not his client's interest, unless it is a mere matter of courtesy, violates his duty of zealous advocacy.

**9.** I use the word "permanently" because the litigation in question is more than twenty years old and not very many judges have careers lasting

more than twenty years. Furthermore, moving Defendants suggest no line between twenty year old representation and forty year old representation.

**10.** See Evangelium Vitae, Encyclical Letter of Pope John Paul II, at ¶56; Personal Morality and "Judicial Decision-making in the Death Penalty Context," Ori Lev—11 Journal of Law & Religion 637 (1995).

Moving Defendants' example of my co-employment with Mr. Faruki suggests that a judge can never hear a case in which a party is represented by a former colleague. This again would effectively bar prosecutors and public defenders from judicial service and make it very difficult for judicial alumni of large firms or several firms to carry their fair share of the docket. Virtually all judges disqualify themselves for a time from cases involving their former firms and I did so, handling virtually no Smith & Schnacke cases my first seven years on the bench. But I do not believe the reasonable observer would believe such a bar ought to extend forever.

In any event it is bias toward or prejudice against a party, and not the party's attorney, which is disqualifying. *In Re Beard,* 811 F.2d 818, 830 (4th Cir.1987), citing *Davis v. Board of School Com'rs of Mobile County,* 517 F.2d 1044, 1050–52 (5th Cir.1975), *cert. denied* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976), and 13A Wright, Miller & Cooper, FEDERAL PRACTICE & PROCEDURE § 3542 at 576.

I am almost certainly aware, as moving Defendants suggest, of facts relating to the Danis business which "would not ordinarily be known to another judge." I doubt, for example, that any other local judge knows that Mr. Arthur Dudzinski was once the operational head of Danis's trash business. Growing up, I knew that Danis' "colors" were red and yellow, while Shook's were green and white. Would a reasonable observer think this made a difference? The critical point is that I have no extrajudicial knowledge of any disputed evidentiary fact relating to the present litigation. See § 455(b)(1).

Moving Defendants suggest I may have acquired technical information about landfill construction and operation that is not generally known to the public. I seem to recall, vaguely, that the North Sanitary Clay Township was to have been dug in 40–70' of clay and to have been unlined, facts which, while not known to the general public, were probably known to all the Clay Township residents in the vicinity of the proposed site. But even a substantial body of technical knowledge about a subject is not disqualifying. See

*United States v. Bonds,* 18 F.3d 1327 (6th Cir.1994)(Opinion of Boggs, J., on suggested disqualification based on his having attended a seminar on DNA testing). By dint of having heard thousands of traffic cases in twenty-one years on the bench, I know a great deal about traffic radar and the Intoxilyzer (e.g., that the latter is a narrow band infrared spectrophotometer) not known by the general public. That knowledge makes it likely I will reject some nonsensical suggestions about speeding or driving under the influence, regardless of which side offers them, not that I am disqualified.

The moving Defendants also seek disqualification on the basis of my having presided in the Danis Clarkco v. German Township case. They claim to recognize the principle that disqualifying facts must be extrajudicial, but the point deserves more emphasis than they give it. A disqualifying prejudice or bias must ordinarily be personal or extrajudicial. *Wheeler v. Southland Corp.,* 875 F.2d 1246, 1250 (6th Cir.1989). That is, it "must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *United States v. Grinnell Corp.,* 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966); *see also Bradley v. Milliken,* 620 F.2d 1143 (6th Cir.1980), *cert. denied,* 449 U.S. 870, 101 S.Ct. 207, 66 L.Ed.2d 89 (1980). The Supreme Court has recently written:

> "The fact that an opinion held by a judge derives from a source outside judicial proceedings is not a *necessary* condition for 'bias and prejudice' recusal, since predispositions developed during the course of a trial will sometimes (albeit rarely) suffice. Nor is it a *sufficient* condition for 'bias and prejudice' recusal, since some opinions acquired outside the context of judicial proceedings (for example, the judge's view of the law acquired in scholarly reading) will not suffice.... **[J]udicial rulings alone almost never constitute valid basis for a bias or partiality motion.** See *United States v. Grinnell Corp.,* 384 U.S. 563, 583, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).... Second, opinions formed by the judge on the basis of facts introduced or events

occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible."

*Liteky v. United States,* 510 U.S. 540, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994)(emphasis supplied).

The Court went on to hold:

> *Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.

*Id.*

Liteky specifically approves retrial before the same judge of cases remanded by courts of appeals.

The principal focus of moving Defendants' complaint about my involvement in the prior case is the **tone of a footnote** (Motion, pp. 7–8). The principal Report and Recommendations in the prior case was 62 pages long. In the midst of that lengthy Report there is a footnote on page 13 in which I quoted a Second District Court of Appeals opinion in which that court said it had found "evidence of fraud against Danis by Clark County officials." Although I had also reported in the footnote that the Ohio Supreme Court had reversed the Court of Appeals, the moving Defendants find evidence of bias and prejudice in my "emphasis" of the Court of Appeals opinion instead of the Supreme Court opinion. The matter discussed in the footnote was certainly not central to the prior case or even material; that is why it was relegated to a footnote. I simply do not believe a reasonable observer would find an accurate quotation by one judge from another court's opinion was a "display a deep-

seated favoritism or antagonism that would make fair judgment impossible." *Liteky, supra.*

Among the facts a reasonable observer would need to know in assessing my impartiality in this case is that the last attorney-sponsored [11] motion to recuse me was in *Ridder v. Springfield,* 109 F.3d 288, 297 (6th Cir.1997), *cert. denied* —— U.S. ——, 118 S.Ct. 687, 139 L.Ed.2d 634 (1998). In that case, in which all but one of the defendants were public officials in Clark County, including the prosecutor and the sheriff, the plaintiff took all the way to the United States Supreme Court his allegations that I was biased and prejudiced in favor of the defendants. Obviously this is not conclusive proof I could not be possibly be biased against other Clark County officials or biased in favor of landfills proposed by the Danis company, but I believe the disinterested observer would find it relevant.

In sum the model of judging suggested by the moving Defendants is more like the model of an ideal juror: a person with no prior knowledge relating to the subject matter or events of the case, no knowledge of the attorneys or witnesses or parties, no prior involvement in any similar case, no media exposure to the particular case, no preconceived ideas about what burglary or antitrust or landfill cases are about. Those veniremen with any such knowledge can be challenged for cause and the few stragglers about whom a lawyer has doubt can be peremptorily challenged. Our judicial system has few enough jury trials that we can approach this model of a juror, since we only have to ask citizens to sit as jurors once or twice in a lifetime. Judges, however, are professional managers and deciders of cases. Any one of them who has decided even one case will have decided in favor of one set of arguments and interests and against another. The fact that I have decided one landfill case in favor of the proposed developer does not disqualify me from handling another landfill case. Judge Jerome Frank stated the problem far more eloquently than I can hope to:

---

**11.** Motions to disqualify by *pro se* litigant are fairly common. See, e.g., *Davis v. Deddens,* 1998 U.S. Dist. LEXIS 7260, 1998 WL 259914 (S.D.Ohio 1998)(copy attached as Exhibit A to the Motion).

Democracy must, indeed, fail unless our courts try cases fairly, and there can be no fair trial before a judge lacking in impartiality and disinterestedness. If, however, "bias" and "impartiality" be defined to mean the total absence of preconceptions in the mind of the judge, then no one has ever had a fair trial and no one ever will. The human mind, even at infancy, is no blank piece of paper. We are born with predispositions; and the process of education, formal and informal, creates attitudes in all men which affect them in judging situations, attitudes which precede reasoning in particular instances and which, therefore, by definition, are prejudices.... Interests, points of view, preferences, are the essence of living. Only death yields complete dispassionateness, for such dispassionateness signifies utter indifference....

Much harm is done by the myth that merely by putting on a black robe and taking the oath of office as a judge, a man ceases to be human and strips himself of all predilections, becomes a passionless thinking machine. The concealment of the human element in the judicial process allows that element to operate in an exaggerated manner; the sunlight of awareness has an antiseptic effect on prejudices. Freely avowing that he is a human being, the judge can and should, through self-scrutiny, prevent the operation of this class of biases....

Disinterestedness does not mean childlike innocence. If the judge did not form judgments of the actors in those courtrooms dramas called trials, he could never render decisions.

*In re J.P. Linahan, Inc.*, 138 F.2d 650, 651–54 (2d Cir.1943).

The Motion to Disqualify is DENIED.